744 A.2d 717

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**William BASEMORE, Appellant.**

Supreme Court of Pennsylvania.

Submitted July 12, 1999.

Decided Jan. 20, 2000.

Reargument Denied April 5, 2000.

Robert Brett Dunham, Philadelphia, for William Basemore.

Catherine Marshall, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Office of Attorney General.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

This is an appeal in a capital case from an order of the Court of Common Pleas of Philadelphia County denying post-conviction relief.

On December 23, 1986, Appellant, William Basemore ("Basemore"), gained entry, without permission, to the premises of his former employer, the Riverfront Dinner Theater in Philadelphia, by removing slats in the window of the men's bathroom. Using a homemade hook device, he pulled through the window an acetylene tank, an oxygen tank, a cutting torch, and martial arts weapons, which included a knife and a homemade spear that had attached a throwing knife and a four-point throwing star at opposite ends. Once inside, Basemore murdered an elderly security guard, stabbing him with the knife several times in the neck, chest, and shoulder area. Basemore then dragged the guard's body into the sales office where a safe was located, and, using the cutting torch, breached the safe and removed money and imitation gold coins. Upon fleeing, Basemore left behind the safe-cutting equipment and his weapons. The police ultimately traced these items to Basemore and later executed arrest and search warrants at his residence, at which time Basemore made certain incriminating statements. In addition, the search revealed items taken from the Riverfront Dinner Theater safe, martial arts equipment similar to that found at the scene, and clothing of Basemore stained with the victim's blood.

At trial, Basemore requested a continuance, claiming that the defense investigation was incomplete and that he wished to have new counsel appointed to represent him. The trial court questioned counsel as to his preparedness, and counsel responded by outlining his preparation for the guilt phase of the trial. Upon being satisfied that counsel was ready to proceed, the trial court denied Basemore's requests. Apparently dissatisfied with the trial court's ruling, Basemore repeatedly disrupted the jury selection proceedings, stating at one point that he had placed counsel under surveillance, and

that civil suits were pending against counsel, neither of which was true. When Basemore refused to abide by the court's order to refrain from such conduct, he was removed from the courtroom for the remainder of the trial.

As a result of Basemore's behavior, the trial court ordered a mental health evaluation, which was conducted by a psychiatrist, Robert Stanton, M.D., who had evaluated Basemore approximately six months earlier in connection with an unrelated robbery (also involving a former employer). In his previous evaluation, Dr. Stanton noted that Basemore denied any history of psychiatric illness, treatment or hospitalization and denied experiencing delusions, hallucinations or suicidal ideation. Dr. Stanton found Basemore to be alert and cooperative and concluded that his insight and judgment were adequate. Although Dr. Stanton reported that Basemore suffered some degree of anxiety and suspicion, he found no evidence of psychosis. Dr. Stanton diagnosed Basemore as having a mixed personality disorder, with passive-aggressive and schizoid features, also noting that Basemore appeared to have underlying emotional instability.

In the second evaluation, conducted at the beginning of Basemore's trial, Dr. Stanton referenced his earlier report, reiterating the same diagnoses. On this occasion, however, Basemore was unwilling to provide any information. Nevertheless, Dr. Stanton found no evidence of psychosis, noting that Basemore's behavior, specifically his refusal to cooperate, appeared to be volitional. Thus, Dr. Stanton concluded that there was no reason to believe that Basemore's ability to take part in the trial was impaired by any psychotic process.

Basemore was found guilty of first-degree murder, robbery, burglary, and possession of an instrument of crime. Prior to the penalty phase, the defense obtained a ruling from the trial court limiting the use of Basemore's prior robbery conviction to rebutting character evidence suggesting that he was truthful or law-abiding. The trial court also ruled that the conviction would be admissible to rebut an argument that Basemore had no significant history of prior criminal convictions pursuant to the statutory mitigator in Section 9711(e)(1) of the

Sentencing Code, 42 Pa.C.S. § 9711(e)(1). The Commonwealth sought to establish as an aggravating circumstance that Basemore had committed the murder during the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6).

In addition to limiting the defense mitigation evidence consistent with the trial court's ruling, trial counsel elected not to present testimony from certain of Basemore's family members. In particular, counsel was concerned that those family members who lived with Basemore had access to the fruits of the crime (the money and gold coins) and could be cross-examined regarding their knowledge of such items. Counsel also declined to present testimony from Basemore's mother because she had provided a statement to the police in which she indicated that Basemore practiced karate at night in a cemetery. Thus, the defense offered in mitigation: Basemore's age at the time of the offense, twenty-two years; through the testimony from his former girlfriend, Stacy Williams, that he had a son to whom he had contributed financial support; and that he had participated in community activities. *See* 42 Pa.C.S. § 9711(e)(4), (8). The jury found the aggravating circumstance but no mitigating circumstances and sentenced Basemore to death.

Following the verdict, trial counsel was permitted to withdraw, and new counsel was appointed for post-verdict motions, which raised issues as to trial counsel's effectiveness. As part of a pre-sentence investigation, Dr. Stanton evaluated Basemore for a third time. Dr. Stanton reiterated many of the findings from his previous examinations, specifically, that Basemore showed no evidence of psychosis, and that he had a mixed personality disorder with passive aggressive and schizoid features in addition to an underlying emotional disorder. Dr. Stanton concluded that Basemore did not have a major mental illness and was capable of taking part in the sentencing proceeding. The pre-sentence report from Basemore's prior robbery conviction was updated, and it indicated, *inter alia*, that Basemore "always received the material necessities as well as the emotional needs including love, attention, guidance and proper discipline according to him and his mother." Post-

verdict motions were denied, and Basemore was sentenced on the remaining offenses. On direct appeal, this Court affirmed, *see Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861 (1990), and the United States Supreme Court denied *certiorari. See Basemore v. Pennsylvania*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992).

On January 20, 1995, Basemore filed a *pro se* petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"). In his petition, Basemore alleged that trial counsel was ineffective for: failing to call certain witnesses during the guilt phase of the trial; not objecting to the testimony from the proprietor of a martial arts store where Basemore had purchased martial arts supplies; and not objecting to the admissibility of the Commonwealth's blood evidence.[1] Counsel was appointed and, on July 26, 1995, filed a letter stating that Basemore's petition was without merit and that there were no meritorious issues that could be presented in an amended petition. *See Commonwealth v. Turner*, 518 Pa. 491, 494–95, 544 A.2d 927, 928 (1988)(setting forth the procedure for counsel to withdraw when the issues raised in a post-conviction proceeding are meritless). Subsequently, counsel moved to withdraw the "no merit letter" and to submit an amended PCRA petition alleging, in pertinent part, trial counsel's ineffectiveness in failing to investigate, prepare and present certain mitigating evidence in the penalty phase of trial. The PCRA court ordered the "no merit letter" withdrawn and allowed Basemore to amend his PCRA petition. On January 10, 1996, counsel from the Center for Legal Education, Advocacy & Defense Assistance ("CLEADA") also entered an appearance on behalf of Basemore.

From December of 1996 through April of 1997, the PCRA court conducted hearings, the focus of which concerned trial counsel's alleged failure to investigate and present available mitigation evidence relating to Basemore's traumatic childhood and mental illness. During the hearings, Basemore

1. In addition to the evidence of the victim's blood found on Basemore's clothes, the Commonwealth also offered evidence consisting of Basemore's blood, which was found at the crime scene.

presented testimony from Stacy Williams and an individual with whom he worked, Cheryl Hawkins, with both women relating that Basemore was withdrawn, dressed strangely, and, at times, thought he was David Bowie or a ninja. Ms. Williams said that trial counsel never asked her about Basemore's behavior, and Ms. Hawkins testified that she was never contacted. Basemore's sisters, Charlotte Emfinger and Angelina Coleman, brother, Dennis Mease, and mother, Josephine Mease, testified that Basemore was physically abused as a child by his father, acted and dressed strangely, and, when he was eight or nine years of age, had fallen from a second story window striking his head.[2] Ms. Emfinger also related that Basemore thought that he was a ninja. The family members explained that trial counsel had never inquired of them regarding Basemore's background.

Testimony was also presented from a psychologist, Jethrow Toomer, who evaluated Basemore in September of 1995 and diagnosed him as having schizophrenia, without hallucinations, which he characterized as a schizo-affective disorder. Dr. Toomer opined that Basemore was suffering from this disorder at the time he committed the murder, that it was an extreme mental or emotional disorder, and that Basemore did not understand the criminality of his conduct. Although Dr. Toomer agreed with Dr. Stanton's earlier findings, he noted that schizoid personality traits often precede schizophrenia. Dr. Toomer indicated that Basemore's response to certain test questions suggested that he may suffer from some organic impairment, although there were no objective test results to confirm such a conclusion.

In addition, Basemore presented testimony from Robert Phillips, M.D., a forensic psychiatrist, who evaluated Basemore in November of 1996. Dr. Phillips reached a different diagnosis than Dr. Toomer, concluding that Basemore suffered from bipolar disorder and a personality disorder with schizoid

2. None of the witnesses actually observed the alleged incident, and Basemore was not hospitalized or, for that matter, immediately taken to the hospital. When Basemore was later seen by a physician, he was purportedly diagnosed as having a "slight concussion" and no broken bones.

and narcissistic features. Dr. Phillips disagreed with Dr. Toomer's opinion that Basemore lacked the capacity to understand the criminality of his conduct, but agreed that Basemore was suffering from an extreme mental and emotional disturbance at the time of the offense, and that his ability to conform his conduct to the requirements of the law was substantially impaired. While acknowledging that Basemore was not acutely psychotic during Dr. Stanton's examinations, Dr. Phillips stated that there were some indications in Dr. Stanton's reports that would warrant further exploration, particularly, the references to an underlying emotional instability. Both Dr. Toomer and Dr. Phillips conceded that there were no hospital records on Basemore reflecting any mental health issues; nor did his school and prison records indicate any issue in this regard. Thus, their diagnoses were essentially based upon interviews with Basemore and information from his friends and family members.

Trial and appellate counsel testified during the hearings. Trial counsel explained that he had interviewed Basemore regarding his background and conducted a similar inquiry of Basemore's mother in his numerous conversations, and that there was never any mention of mental health problems, head trauma, or Basemore's difficult childhood. Indeed, to the contrary, trial counsel testified that Basemore's letters and conversations suggested the absence of such circumstances. Although trial counsel had no specific recollection of the exact questions he asked, he said that his general practice was to also inquire of his clients about past medical and psychiatric treatment. In addition, trial counsel indicated that he explained to Basemore and his family the nature of the penalty phase of trial and the role of mitigating evidence, asking for any information that may be helpful. Trial counsel also obtained Basemore's school records and, although he did not have the pre-sentence report and the initial mental health evaluation, he reviewed Dr. Stanton's second mental health evaluation. Notably, trial counsel testified that nothing in the second evaluation alerted him to a mental health issue for purposes of mitigation, since the diagnoses did not, in coun-

sel's opinion, constitute a major mental illness. Indeed, trial counsel acknowledged that had he been aware of Basemore's diagnoses as testified to by Drs. Toomer and Phillips, he would have considered presenting such evidence.

Appellate counsel testified that, as is his practice, he reviewed the pre-sentence and psychiatric reports with Basemore, and that he never received information suggesting that Basemore was abused as a child, suffered any trauma, or had mental health problems. Based upon Dr. Stanton's conclusion that Basemore did not have a major mental illness, appellate counsel did not investigate whether any mental health issues existed. Although the Commonwealth obtained an additional listing of the case for the purposes of consulting with an expert and presenting rebuttal testimony, no rebuttal testimony was presented, and the Commonwealth rested relying primarily upon its cross-examination of Basemore's witnesses and Dr. Stanton's competency evaluations.

Near the conclusion of the PCRA hearings, counsel from CLEADA orally indicated to the court his intention to supplement Basemore's PCRA petition with a claim that there had been discrimination in the jury selection process. This claim was premised primarily upon a video training tape allegedly utilized by the Philadelphia District Attorney's Office at or about the time of Basemore's trial. At that time, the PCRA court granted leave to file, but expressed an unwillingness to consider evidence or grant favorable consideration. Subsequently, CLEADA filed a "Supplement to Petition for Habeas Corpus Relief and for Post Conviction Relief," which requested an evidentiary hearing and alleged that Basemore was entitled to a new trial as the training tape reflected that the District Attorney's Office had a policy of exercising peremptory challenges to jurors in a racially discriminatory manner.[3]

---

3. As Basemore's initial petition sought relief solely under the PCRA, the reference to a petition for habeas corpus relief appears to be an error. Moreover, it appears that the PCRA treated the submission as in the nature of an amendment, subject to Pa.R.Crim.P. 1505 (stating that "[a]mendment shall be freely allowed to achieve substantial justice"), as it chose to address it on its merits in the context of the existing PCRA proceeding.

On October 8, 1997, the PCRA court dismissed Basemore's petition. Regarding Basemore's argument of racial bias in the jury selection process, the PCRA court determined that it was premised upon pure speculation. Respecting the penalty phase claim, although it did not make specific factual findings or resolve the credibility issues stemming from the conflicting testimony of trial counsel and Basemore's family members, the PCRA court stated that counsel was never advised of any evidence indicating that Basemore was abused as a child or suffered from mental health problems. The court thus concluded that counsel was not ineffective for failing to investigate "a family background or mental illness about which he was never told." Moreover, the PCRA court concluded that Basemore had failed to establish that the proposed mental health testimony would have been admissible, since neither expert testified that Basemore's mental illness existed at the time of his offense,[4] and their opinions were based solely upon information from Basemore and his family.

Court-appointed PCRA counsel perfected an appeal on Basemore's behalf, and thereafter CLEADA filed a statement of matters complained of on appeal, *see* Pa.R.A.P.1925(b), raising the same issues presented to the PCRA court.[5] In his brief to this Court, however, Basemore has raised eight new issues that were not presented to the PCRA court or included in his Rule 1925(b) statement. Those issues include: whether he is entitled to relief because counsel was ineffective in failing to develop and present evidence of incompetency or request a competency hearing at the time of trial; whether the trial court issued an improper instruction on accomplice liability; whether the trial court's sentencing phase jury instructions improperly indicated that the jury's findings concerning mitigating circumstances were required to be unanimous before such factors could be considered; whether the trial court should have instructed the jury that life imprisonment means

4. As discussed below, this statement is contradicted by the record.

5. Court-appointed PCRA counsel petitioned to withdraw from the case, citing CLEADA's representation of Basemore, and this Court granted the petition on April 6, 1999.

life without the possibility of parole; whether the trial court improperly denied Basemore's request for new counsel at the time of trial; whether Basemore was denied the effective assistance of counsel during jury selection, resulting in a denial of an impartial capital sentencing jury; whether this Court should remand for the resolution of recently discovered claims regarding racial discrimination in capital sentencing; and whether the cumulative impact of the errors entitles Basemore to relief.

Because Basemore raises a number of issues that were not presented to the PCRA court, as a threshold matter, we must determine if these issues are waived. *See* 42 Pa.C.S. § 9543(a)(3)(i)(establishing, as a requirement to relief under the PCRA, that "[t]he allegation of error has not been waived").[6] Under the PCRA, waiver occurs if the petitioner could have raised the issue but failed to do so before trial, at trial, on appeal, or in a prior state post-conviction proceeding. 42 Pa.C.S. § 9544(b); *see also* Pa.R.A.P. 302(a)(stating that issues not raised in the lower court are waived and cannot be raised for the first time on appeal); *Commonwealth v. Lord*, 553 Pa. 415, 420, 719 A.2d 306, 309 (1998)(noting that issues not raised in a party's Rule 1925(b) statement will be deemed waived).

Basemore argues that his claims can be addressed, despite the failure to present them to the PCRA court, under the "relaxed waiver" rule. *See Commonwealth v. DeHart*, 539 Pa. 5, 25, 650 A.2d 38, 48 (1994). In *Commonwealth v. Albrecht*,

---

**6.** Pursuant to the express terms of the version of the PCRA in effect at the time Basemore filed his petition, such waiver could be excused:

(ii) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual.

(iii) If the allegation of error has been waived, the waiver of the allegation of error during pre-trial, trial, post-trial, or direct appeal proceedings does not constitute a State procedural default barring Federal Habeas Corpus relief.

42 Pa.C.S. § 9543(a)(3)(ii–iii). The General Assembly amended the PCRA in 1995 eliminating these statutory exceptions. As noted, Basemore's claims are governed by the pre–1995 version of the PCRA. *See generally Commonwealth v. Laird*, 555 Pa. 629, 640, 726 A.2d 346, 351 (1999).

554 Pa. 31, 720 A.2d 693 (1998), however, this Court explained that "waiver must necessarily be recognized at some point in the criminal process in order that finality be eventually achieved[, and that] the post conviction appellate stage is an appropriate time to enforce the rules of waiver." *Id.* at 44–45, 720 A.2d at 700. Basemore maintains, nevertheless, that the application of *Albrecht* to his appeal constitutes a retroactive application of a new rule of law, which is fundamentally unfair and violates the Due Process and the *Ex Post Facto* Clauses of the Pennsylvania and United States Constitutions.

 Although Basemore does not specifically state whether the nature of the alleged due process violation is procedural or substantive, his argument is premised upon adequate notice and the opportunity to defend oneself before a fair and impartial tribunal, concerns which are inherent in the concept of procedural due process. *See Commonwealth v. Fahy,* 558 Pa. 313, 324–26, 737 A.2d 214, 220 (1999). Basemore was not, however, denied notice and the opportunity to be heard before an impartial tribunal regarding his claims simply because he, like any other post-conviction litigant, is required by the PCRA and the Rules of Appellate Procedure to properly raise and preserve those issues he wishes to pursue on appeal. Indeed, Basemore was afforded the opportunity to defend himself at trial, on direct appeal, in evidentiary hearings on his PCRA petition, and now on appellate review of the collateral proceedings. As the decision in *Albrecht* merely represents a clarification of the existing standard for reviewing appeals from the denial of post conviction petitions in capital cases, it is applicable to all similar cases currently under review by this Court. *See Commonwealth v. Pursell,* 555 Pa. 233, 252–53, 724 A.2d 293, 303, *cert. denied,* —— U.S. ——, 120 S.Ct. 422, 145 L.Ed.2d 330 (1999).[7]

**7.** Basemore's argument respecting the *Ex Post Facto* Clause is equally meritless, as its prohibition pertains to laws imposing penal sanctions, *see Office of Disciplinary Counsel v. Zdrok,* 538 Pa. 41, 49, 645 A.2d 830, 834 (1994), and the clarification of the review standard does not constitute a penal sanction.

Alternatively, Basemore asserts that the issues raised for the first time before this Court may be reviewed because: court-appointed PCRA counsel was ineffective; this constitutes the earliest point in time in which PCRA counsel's ineffectiveness could have been raised, *see Commonwealth v. Wallace,* 555 Pa. 397, 406, 724 A.2d 916, 921 (1999); and ineffective assistance of counsel excuses waiver under the PCRA. *See Commonwealth v. Christy,* 540 Pa. 192, 201, 656 A.2d 877, 888, *cert. denied,* 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995). In this regard, CLEADA maintains that its appearance in the PCRA proceedings was solely for the purpose of presenting evidence relative to the mitigation phase issues. In support of such contention, CLEADA cites to instances during the PCRA hearings in which the court stated that Basemore was represented by court–appointed PCRA counsel and that CLEADA was merely assisting him.

■ While the PCRA court made statements to this effect, contrary to CLEADA's representation, these statements do not constitute formal findings and do not change the fact that CLEADA entered its appearance generally on behalf of Basemore in January of 1996, represented Basemore during the entirety of the PCRA proceedings, raised and argued issues other than those involving mitigation and, significantly, framed the issues on appeal in the Rule 1925(b) statement. Under such circumstances, we decline to treat CLEADA's present representation as either new or distinct from its involvement before the PCRA court. Thus, CLEADA'S brief before this Court does not present the first opportunity to challenge court-appointed counsel's effectiveness, as that opportunity initially arose when CLEADA entered its appearance in the post-conviction court.

■ To avoid any waiver associated with its own representation, CLEADA raises, for the first time in its reply brief, the argument that it was ineffective and thus the issues it now raises can nevertheless be addressed. *See generally Commonwealth v. Green,* 551 Pa. 88, 93, 709 A.2d 382, 384 (1998)(explaining that as a general rule counsel cannot raise his own ineffectiveness, but where it is clear from the record

that counsel was ineffective or that the issue is meritless, an appellate court can address it). A reply brief, however, is an inappropriate means for presenting a new and substantively different issue than that addressed in the original brief. *See Fahy,* 558 Pa. at 322–23 n. 8, 737 A.2d at 218 n. 8.[8] In addition, a claim of ineffectiveness on the part of CLEADA could have been raised in the PCRA court, in Basemore's statement of matters complained of on appeal, or in his original brief. Since this did not occur, any allegation of error in this regard is waived.

The first of the two claims remaining for consideration is Basemore's assertion that the prosecutor violated the Equal Protection Clauses of the United States and Pennsylvania Constitutions in exercising peremptory challenges to prospective jurors during voir dire in a racially discriminatory manner. This claim was raised in the PCRA court by way of a supplemental post-conviction petition,[9] in which Basemore alleged, *inter alia,* that: he is an African American; at trial, the Commonwealth used its peremptory challenges to exclude African Americans from the jury; the recent public revelation of a videotape training session conducted by the Office of the District Attorney reflects that racial discrimination in jury selection was a policy of the Office of the District Attorney at the time of Basemore's trial; the presenter at the training session was then-assistant district attorney Jack McMahon, who conducted the prosecution at Basemore's trial; the videotape establishes that Attorney McMahon's consistent jury selection practices included the use of peremptory challenges based upon race and gender-based stereotypes, as well as the

8. For similar reasons, we decline to address the other new issues and supporting arguments related to waiver that are presented in CLEADA's reply brief, specifically, that Basemore's claims cannot be deemed waived because such a finding: would not constitute a state court procedural default barring federal habeas corpus relief; results in a miscarriage of justice and in the execution of an illegal sentence of death; fails to recognize that competency-related claims cannot be waived and are cognizable under Article I, Section 14 of the Pennsylvania Constitution; and need not be enforced since all issues may be reviewed pursuant to the Court's King's Bench powers.

9. Basemore has also raised this allegation as part of a "Motion for New Trial on Newly Discovered Evidence" filed in this Court.

employment of pretextual reasons to defend against claims of racial bias; the prosecution was aware of this videotape and failed to provide the information to the defense in violation of the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny; and trial counsel was ineffective for failing to object to the racially biased use of peremptory strikes and for failing to raise and preserve such objection on direct appeal. In the supplemental petition, Basemore also requested a hearing on the claim, which was denied. Basemore's appellate brief further asserts, *inter alia,* that: the pertinent training videotape was made sometime in 1987 (within the year preceding Basemore's trial) and was released by the Office of the District Attorney to the public for the first time in April, 1997 (the month preceding Basemore's filing of his supplemental post-conviction petition); the trial record reveals practices employed by Attorney McMahon at trial which reflect the techniques for discrimination described on the videotape, including the utilization of nineteen peremptory challenges to strike African American venirepersons; and records from other capital trials in which Attorney McMahon was the prosecutor also reflect his employment of discriminatory practices in jury selection. In support of his request for relief, Basemore invokes the decisions of the United States Supreme Court in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

 The Commonwealth, for its part, acknowledges the existence of the videotape and that it was made public in 1997, but argues that the contents of the videotape cannot establish discrimination in Basemore's individual case. The Commonwealth emphasizes that Basemore has failed to proffer an evidentiary basis upon which the race of all venirepersons, the potential jurors that were stricken by Attorney McMahon, and the jurors who ultimately were seated can be determined, thus undermining his ability to establish a *prima facie* case. Additionally, according to the Commonwealth, Basemore's claim is waived, and there is no evidence to support his allegations of ineffectiveness on the part of his prior counsel. The Commonwealth asserts that, in any event, Basemore has failed to

allege or establish prejudice as a result of racial discrimination in jury selection.[10]

The United States Supreme Court has, on multiple occasions, reaffirmed the principle that the government denies a defendant equal protection of the laws when it "puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986). For many years, in order to establish a violation of equal protection in the jury selection process, under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), a defendant was required to establish a pattern or practice of purposeful discrimination on the part of the prosecution occurring across multiple cases. *See id.* at 227, 85 S.Ct. at 839; *see also Batson*, 476 U.S. at 92, 106 S.Ct. at 1720. In *Batson*, however, the Court described such requirement as overly burdensome, unworkable, and having the effect of immunizing prosecutors from constitutional scrutiny. *Id.* at 92–93, 106 S.Ct. at 1721. Thus, the *Batson* Court relaxed the evidentiary requirements for determining whether a prosecutor has used his peremptory challenges to discriminate in jury selection, holding that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723.

The *Batson* Court further established the following construct for evaluating a defendant's claim:

10. In order to prevail on a claim of ineffectiveness of counsel made in a post-conviction context, Basemore must establish by a preponderance of the evidence that: the claim has arguable merit; trial counsel had no reasonable basis for proceeding as he did; and but for counsel's errors and omissions, there is a reasonable probability that the outcome of the proceedings would have been different. *See Commonwealth v. Kimball*, 555 Pa. 299, 312, 724 A.2d 326, 333 (1999). Trial counsel is presumed to have been effective, *see Commonwealth v. Copenhefer*, 553 Pa. 285, 301, 719 A.2d 242, 250 (1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 86, 145 L.Ed.2d 73 (1999), and this Court's review of the denial of post-conviction relief is limited to an examination of whether the PCRA court's determination is supported by evidence of record and free from legal error. *See Commonwealth v. Williams*, 557 Pa. 207, 225, 732 A.2d 1167, 1176 (1999).

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 405–06 (1991)(plurality opinion) (citing *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723). To establish a *prima facie* case under *Batson*, the defendant must prove that: he is a member of a cognizable racial group; the State exercised its peremptory challenges to remove members of such group from the venire; and other relevant circumstances raise an inference that the State used peremptory challenges to exclude venirepersons from the same racial group. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723.[11] In connection with this inquiry, the defendant is entitled to rely on the fact that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Id.* at 96, 106 S.Ct. at 1723. The necessary *prima facie* case or "inference of discrimination" may be demonstrated "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose," *Batson*, 476 U.S. at 93–94, 106 S.Ct. at 1721; for example, from a pattern of strikes against minority jurors included in the particular venire or from the manner of the prosecution's questions and statements during *voir dire* examination. *See id.* at 97, 106 S.Ct. at 1723.

Where the presentation of a *prima facie* case of a *Batson* violation is called for, this Court has generally enforced a requirement of a full and complete record of the asserted violation, as it would otherwise be impossible to conduct

11. The Court in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), modified the elements of a *prima facie* case somewhat in holding that racial identity between the defendant and the excluded venirepersons is not necessary. *Id.* at 415, 111 S.Ct. at 1373.

meaningful appellate review of the motivations of prosecutors in individual cases, particularly when such review often occurs years after the trial. *See generally Commonwealth v. Rollins,* 558 Pa. 532, 546 n. 10, 738 A.2d 435, 443 n. 10 (1999). Absent a timely objection and preservation of a trial record, there will most often be no proof of the race of venirepersons; the prosecutor will have had no reason to provide race-neutral explanations; the trial judge will have had no evidence to weigh nor occasion to make an assessment; and, ultimately, there will be nothing available to review on appeal.

Aspects of Basemore's claim suffer from such deficiencies. For example, in his brief before this Court, Basemore contends that the prosecutor used nineteen of his peremptory challenges to remove African–American venirepersons; however, the allegation was not included in Basemore's supplemental post-conviction petition, nor was any witness identified or documentary proof attached. Moreover, although Basemore's brief contains numerous citations to the record of the jury selection proceedings in support of this contention, our review of such record fails to reveal the race of any of the jurors removed by the prosecution. While Basemore also notes that voter registration data contains such information, this material was not provided in connection with the supplemental petition, and the difficulties inherent in the attempt to reconstruct a record including the race of all venirepersons in a jury pool are apparent. Thus, it is clear that Basemore's claim does not comport with the traditional means for establishing a *prima facie* case under *Batson.*

Nevertheless, in addition to offering allegations concerning the manner in which the Commonwealth's peremptory challenges were exercised in his case, Basemore asserts that, through the contents of the training videotape, he can establish, in the prosecutor's own words, not only that Mr. McMahon was of a "mind to discriminate" but also his contemporaneous admissions to a consistent practice of racial discrimination in every case that he tried.

We have reviewed the transcript presented to determine the extent to which its contents, if established as accurate, would

support such a claim. In the document: the purpose of *voir dire,* namely, to select a fair and impartial jury, is denigrated as "ridiculous," in favor of the selection of jurors who will be biased in favor of conviction; various racial and gender stereotypes are described and offered as reasons to discriminate in the selection of jurors; techniques for accomplishing such discrimination are described in detail, including the maintenance of a running tally of the race of the venire panel and the invention of pretextual reasons for exercising peremptory challenges; and a willingness to deceive trial courts to manipulate jury panels to these ends is also expressed. For example, the transcript reflects the following:

[Y]ou got to go by certain rules. [Teaching principles of jury selection is] kind of like teaching blackjack. I can teach you blackjack. I can tell you all the rules to play blackjack and you'll know how to play blackjack, but there's going to be a certain amount of luck. In other words, you can do all the right things. You can take a hit on 17 when he's got a 3 and all this thinking. You can still lose. And that's the way it is in jury selection. But the key is, just as in playing blackjack, is to stay by the rules. . . .

And that's all I can tell you [sic] when you talk to you about this, is to play by certain rules and don't bend them and don't change them.

\* \* \*

The case law says that the object of getting a jury is to get—I wrote it down. I looked in the cases. I had to look this up because I didn't know this was the purpose of a jury. "Voir dire is to get a competent, fair, and impartial jury." Well, that's ridiculous. You're not trying to get that. You're—both sides are trying to get the jury most likely to do whatever they want them to do.

\* \* \*

Like I said, you have to go in there with the idea that you want jurors who are going to be most suited to convicting this defendant; okay?

\* \* \*

Now, I'm going to tell you things that I think over the years that have come to me of doing this. And, again, it's all an individual—anybody tells you anything about trying a case and says it in dogma is wrong because things change and it's different for every individual. But I've had fairly good success with these rules and I think if you stay to them, you'll have fairly good success, too.

And that is—and, let's face it, again, there's the blacks from the low-income areas are less likely to convict. It's just—I understand it. It's understandable proposition. There is a resentment for law enforcement, there's a resentment for authority and, as a result, you don't want those people on your jury. And it may appear as if you're being racist or whatnot, but, again, you are just being realistic. You're just trying to win the case.

\* \* \*

I pick juries quick as could be. I don't even hesitate because I've got these rules down. I never debate. I've got these rules down.... [A]gain, like I said, you've got to stay with these basic rules.

\* \* \*

[I]n my experience, black women, young black women, are very bad. There's an antagonism. I guess maybe because they're downtrodden on two respects, they got two minorities, they're women and they're and blacks, so they're downtrodden in two areas. And they somehow want to take it out on somebody, and you don't want it to be you. And so younger black women are difficult, I've found.

\* \* \*

I've always felt that a jury of like eight whites and four blacks is a great jury, or nine and three.

* * *

And I—and one time we are going picking a jury and this panel was just unbelievable and I was getting murdered. I was like—it was ridiculous. And so what I did is, I started—it was Judge Malmed. I said, "Your Honor, I just don't feel well. I really don't feel well."

He said, "We'll just get through this morning."

And as I got another bad one, bad one, I started to get really worse. I said, "Judge, I can't go on in there. I got diarrhea and I got eh, eh, eh."

* * *

[W]hen a jury comes in the room, the 40 people come in the room, count them. Count the blacks and whites. You want to know at every point in that case where you are. In other words, the 40 come in—you'll never get it just right. You don't want to look there or go, "Is there a black back there? Wait a minute. Are you a black guy?" No, you don't want to do that. You just look and get an estimate. Like I said, 40 come in, you get 25, you say it's 25/15. I mark it down on my sheet, 25/15, and then I know, and then I know how many are left and I know where I am at all times in the jury selection process. And if you lose track or you're not sure of what's going on or you want to—you can always take a recess.

Because a lot of times what they do is they'll like have the next group—the court officers want to set them up. Like remember in that method I told you earlier where they have—now we've picked five, so they're going to bring seven more in. Usually they'll have the next seven sitting right out there in order. So you can see—you can say, "Judge, I have to go to the bathroom." You can go out and see what's left and check out what's left, see what's, you know—because you know you got two strikes left.

* * *

[W]e're all going to have to be aware of [*Batson* ], and the best way to avoid any problems with it is to protect yourself.

And my advice would be in that situation is when you do have a black jury, you question them at length. And on this little sheet that you have, mark something down that you can articulate later time if something happens, because if they—because the way the case is stated, that it's only after a prima facie showing that you're doing this that it becomes—that the trial judge can then order you to then start showing why you're striking them not on a racial basis.

\* \* \*

So sometimes under that line you may want to ask more questions of those people so it gives you more ammunition to make an articulable reason as to why you are striking them, not for race.[12]

Although this Court has found that this tape itself would not suffice to establish a pattern or practice of discrimination on the part of the Office of the District Attorney in general or by assistant district attorneys other than Mr. McMahon,[13] *see, e.g., Rollins,* 558 Pa. at 546 n. 10, 738 A.2d at 443 n. 10, this is the first occasion in which we are confronted with the issue of whether, if demonstrated to be accurate, it may establish an inference of discrimination on the part of Attorney McMahon.

There can be no question that the practices described in the transcript support an inference of invidious discrimination on the part of any proponent. Basemore argues, persuasively, that our requirements concerning the establishment of a *prima facie* case by circumstantial evidence of the prosecutor's

12. It would be premature to comment directly on Attorney McMahon's performance as an attorney and an officer of the court, but we condemn in the strongest terms the practices described in the transcript presented, which flout constitutional principles in a highly flagrant manner. *See generally Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done").

13. Throughout the transcript, the above-described practices are attributed solely to the speaker; there is no statement to the effect that they were sanctioned by the District Attorney or employed by other assistant district attorneys.

motivation (i.e., the races of all potential jurors, stricken venirepersons and jurors ultimately seated) should not, as a matter of law, foreclose consideration of a claim where the petitioner is able to show by direct evidence (the prosecutor's own words) that the prosecutor engaged in a pattern or practice of discrimination. *See generally Batson,* 476 U.S. at 94, 106 S.Ct. at 1722 ("[p]roof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination'" (citations omitted)). In this regard, it is noteworthy that the constructs developed in *Swain* and *Batson* evolved, in the first instance, because of the difficulty in demonstrating the subjective motivations of a prosecutor, since it is exceedingly unlikely that an admission to racial discrimination could be obtained. *See generally Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109 S.Ct. 1775, 1802, 104 L.Ed.2d 268 (1989)(O'Connor, J., concurring)(noting that "direct evidence of intentional discrimination is hard to come by"). While we acknowledge that findings of a *Swain* violation have been rare, where such violations have been found, admissions by the prosecuting attorney have frequently played a prominent role. *See Jackson v. Herring,* 42 F.3d 1350, 1357 (11th Cir.1995)(finding a *Swain* violation, *inter alia,* on the basis of testimony from "the former prosecuting attorney himself ... that there was widespread and systematic misuse of peremptories by the Tuscaloosa D.A.'s office," although dismissing the claim based upon state procedural default analysis); *State v. Washington,* 375 So.2d 1162, 1164 (1979)(finding *Swain* violation on the basis of, *inter alia,* evidence that "the prosecutor himself admits that, solely on the basis of race and without examination as to the individual's particular qualifications or predilections, he consistently excuses black veniremen through the use of his peremptory challenges when the defendant himself is black").

In the present case, the PCRA court refused to consider the videotape on grounds of relevance;[14] however, it

**14.** When Basemore's attorneys first advised the PCRA court of the existence of the videotape and their intent to file a supplemental petition containing a *Batson* claim, the PCRA court stated:

is quite clear that, to the extent that the contents of the tape are otherwise admissible, they are, in fact, relevant, as they constitute direct evidence of the prosecutor's motivations at least at the time the tape was made, and may constitute circumstantial evidence of what occurred in the selection of the jury at Basemore's trial, which is alleged to have been conducted within the year following the training seminar. Therefore, the PCRA court erred in dismissing the claim on such basis without an evidentiary hearing.[15]

▮ It remains to address the Commonwealth's contention that remand for a hearing is unnecessary, because Basemore's *Swain/Batson* claim is waived. Although Basemore's supplemental petition is poorly drafted, particularly in the manner in which it seeks to identify discrete legal bases for his claims, its allegations contain factual predicates for two avenues for overcoming the assertion of waiver—newly discovered evidence, and ineffective assistance of counsel.

The essential allegation underlying a newly discovered evidence claim is that the central proof of a *Swain/Batson* violation, the videotape, was not made available until approximately one and one half months prior to the filing of the supplemental petition. A claim of newly discovered evidence may warrant relief under the PCRA pursuant to Section 9543(a)(2)(vi), pertaining to the unavailability at the time of

> You can or cannot submit it as you choose whenever you want. I can tell you now that I will reject it because based on the facts as I know them, the suggestion is that an inner office memorandum or inner office conversation or inner office instructions in the DA's office should be considered in the determination of facts or matters that arose during the course of the trial, and I can tell you that that is not relevant. .... I would not consider the so-called McMahon tapes whether you bring them up or not.

The PCRA court's opinion disposes of the *Swain/Batson* claim as follows: "[T]his argument is based on pure speculation concerning the bias of the Assistant District Attorney who prosecuted the case, has no record basis and will not be considered further."

15. While the record does not reflect that the transcript itself had been presented to the PCRA court in connection with the filing of the supplemental petition, sufficient description of its contents was contained within the supplemental petition to apprise the court of the essential allegations.

trial of exculpatory evidence. *See* 42 Pa.C.S. § 9543(a)(2)(vi). The Superior Court has also found relief available on a post-conviction claim involving newly discovered evidence pursuant to Section 9543(a)(2)(i), where a constitutional violation is involved. *See Commonwealth v. Galloway*, 433 Pa.Super. 222, 228 n. 6, 640 A.2d 454, 457 & n. 6, *appeal denied*, 538 Pa. 666, 649 A.2d 668 (1994), *cert. denied*, 514 U.S. 1039, 115 S.Ct. 1407, 131 L.Ed.2d 294 (1995). While the allegations at issue here are not exculpatory, they do invoke the fundamental constitutional right to judgment by a jury of one's peers. *See Batson*, 476 U.S. at 86, 106 S.Ct. at 1717. Moreover, the averments are of concealment on the part of the government, both in terms of the previous nondisclosure of the videotape at the time of trial and thereafter, and in the inherently covert nature of conduct constituting the underlying violation.[16] Additionally, the merits and waiver questions appear to be intertwined, as the allegations of nondisclosure and concealment underlie not only Basemore's claim for relief, but also his counterattack upon the Commonwealth's assertion of waiver. Given the highly unusual circumstances alleged, as well as the nature of the proof asserted, it is at least arguable that Basemore's claim of recent discovery of concealed government activity implicating the fundamental fairness of his trial would state a claim for relief under Section 9543(a)(2)(i), although the issue has not previously been raised.[17] Under such unique

**16.** Notably, as in the present case, the newly discovered evidence asserted in *Galloway* included proofs of wrongful suppression on the part of the government. *See Galloway*, 433 Pa.Super. at 227–28, 640 A.2d at 456–57.

**17.** We find, however, that the second allegation that would form a predicate for overcoming waiver, ineffective assistance of counsel, lacks arguable merit. Obviously, for counsel to be deemed ineffective for failing to recognize a *prima facie* case of discrimination, the indicia of bias he is alleged to have overlooked must have been discernible to him in the relevant time frame. Thus, there is no reasonable claim that counsel was ineffective in relation to the contents of the videotape, since they are alleged to have been unavailable to the public prior to 1997. Moreover, to the extent that counsel is alleged to have been ineffective for failing to recognize discrimination in the prosecutor's assertion of peremptory challenges at trial, our precedent supports dismissal of such claims where they are not supported in the underlying trial record and a sufficient evidentiary basis is not apparent from the

circumstances, while we do not foreclose the possibility that Basemore's *Swain/Batson* claim may ultimately be resolved on grounds of waiver, we believe that the best course would be to permit Basemore the opportunity to develop a record concerning the asserted violation, Mr. McMahon's conduct and its implications with respect to his trial.

In reaching this conclusion, we also find it significant that Basemore's allegations touch upon other cases, and, in an even broader sense, tactics of the sort reflected in the transcript impugn the legitimacy of the judicial process. As the Supreme Court has observed:

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is "a stimulant to that race prejudice which is an impediment to securing to [African Americans] that equal justice which the law aims to secure to all others."

*Batson*, 476 U.S. at 87–88, 106 S.Ct. at 1718. Thus, where proofs of the sort presented here are set out, the merits of an allegation concerning a prosecutor's own public admission to personally engaging in a pervasive pattern of discrimination, as well as the associated issue of waiver, are best determined on a full and complete record.

 Finally, in response to the Commonwealth's argument that Basemore's claims must be dismissed for failure to allege sufficient prejudice, we note that *Batson* violations fall within a limited and unique category of claims which, by the nature of their impact upon the fundamental fairness of a trial, are not subject to conventional harmless error or prejudice analysis.[18] Moreover, under the Pennsylvania capital sentencing

post-conviction pleading and attachments. *See, e.g., Rollins,* 558 Pa. at 546 n. 10, 738 A.2d at 443 n. 10.

**18.** *See, e.g., Neder v. United States,* 527 U.S. 1, ——, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999)(stating that certain limited constitutional errors resulting in a " 'defect affecting the framework within which the

scheme, a jury determines not only the defendant's guilt or innocence, but also whether the death penalty will be imposed. Thus, while we agree with the Commonwealth that the evidence of guilt in this case was overwhelming, we find it significant that the claim that a fair and impartial jury was not empaneled also calls into question the reliability of the sentencing determination.

In summary, Basemore has set forth sufficient material facts to warrant an evidentiary hearing on his claim of racial discrimination in jury selection.

Regarding Basemore's remaining claim of error in the penalty phase of his trial, he argues that trial counsel failed to perform any investigation into Basemore's "abusive, deprived and traumatic childhood or his impaired mental health," and that such failure is evidenced by trial counsel's testimony that he "never discussed [Basemore's] family background or mental health with [him] or his family." Basemore further contends that trial counsel's only effort to investigate mitigating evidence occurred after the verdict of guilt, and consisted of briefly interviewing Stacy Williams, the sole witness presented during the penalty proceeding. Had trial counsel conducted any mitigation investigation, Basemore maintains, evidence of his poverty-stricken, traumatic, and abusive childhood could have been presented through testimony from members of his family. In a similar vein, Basemore asserts that trial counsel ignored the mental health issues, to which he should have been alerted by the nature of the crime and Dr. Stanton's

trial proceeds, rather than simply an error in the trial process itself' ... deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair' " (citations omitted)); *Vasquez v. Hillery*, 474 U.S. 254, 263–64, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986)(finding that racial discrimination in selection of grand jury falls within the limited class of cases involving structural error); *McGurk v. Stenberg*, 163 F.3d 470, 474 (8th Cir.1998)(concluding that a structural error required reversal, although the claim proceeded through a claim of ineffective assistance of counsel and was made in the post-conviction setting); *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir.1998)(noting that a *Batson* violation is a structural defect). *Cf. Commonwealth v. Lantzy*, 558 Pa. 214, 225, 736 A.2d 564, 571 (1999).

second mental health evaluation. Such evidence could have been presented through testimony from Basemore's family, friends, and Drs. Toomer and Phillips, and, in conjunction with his traumatic childhood, would have been relevant to whether he was under the influence of an extreme mental and emotional disturbance and/or lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the law, as well as constituting evidence of mitigation related to Basemore's character or the circumstances of the offense. *See* 42 Pa.C.S. § 9711(e)(2), (3), (8).

The Commonwealth responds that trial counsel conducted adequate investigation into Basemore's mental health by asking Basemore and his mother background questions, and counsel testified that his practice was to inquire about past psychiatric treatment. The Commonwealth also argues that the contemporaneous mental health evidence, Dr. Stanton's reports, indicated an absence of a major mental illness and, consequently, counsel had no reason to further investigate.

Counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). Where counsel has made a strategic decision after a thorough investigation of law and facts, it is virtually unchallengeable; strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. *See id.* at 690–91, 104 S.Ct. at 2066. As noted, an evaluation of counsel's performance is highly deferential, and the reasonableness of counsel's decisions cannot be based upon the distorting effects of hindsight. *See id.* at 689, 104 S.Ct. at 2065. Furthermore, reasonableness in this context depends, in critical part, upon the information supplied by the defendant. *See Commonwealth v. Peterkin,* 511 Pa. 299, 319, 513 A.2d 373, 383 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). Thus, assuming a reasonable investigation, where there is no notice to counsel of particular mitigating evidence, he cannot be held ineffective for failing to

pursue it. *See Commonwealth v. Howard,* 553 Pa. 266, 276, 719 A.2d 233, 238 (1998).

In the present case, the disposition of Basemore's claims concerning his trial counsel's effectiveness is hampered by a series of defaults on the part of the PCRA court. Respecting Basemore's purportedly traumatic childhood and head injury, the PCRA court's sole finding was "that [trial counsel] spoke with petitioner and his mother on more than one occasion and neither of them alluded to any abuse during petitioner's childhood or to mental problems in petitioner's background." From this statement, it appears that the PCRA court may have sought to credit trial counsel's testimony that he interviewed both Basemore and his mother regarding background information, described the penalty phase to Basemore and his family, asked for any information that may be helpful, and was never advised of the allegedly traumatic childhood and head injury. Such an interpretation would also be supported by the testimony of appellate counsel and the statement in the pre-sentence report that Basemore "always received the material necessities as well as the emotional needs including love, attention, guidance and proper discipline according to him and his mother." This evidence and the inferences that can be drawn from it, however, are contradicted by the testimony of Basemore's mother and other family members to the effect that trial counsel had never inquired into Basemore's background. Rather than resolving this credibility issue, the PCRA court skirted it by merely concluding that trial counsel was not advised of the potentially mitigating evidence. Obviously, however, different light falls upon counsel's performance depending upon whether he asked and was not told, or he did not ask and therefore was not told. *See generally Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. In view of the evidence presented, the PCRA court was remiss in failing to make specific findings as to the adequacy of the investigation performed.[19] *See generally Williams,* 557 Pa. at 232–33, 732 A.2d at 1189–90 (remanding to a PCRA court for

---

**19.** We acknowledge that the record reflects trial counsel's understandable difficulty in recollecting certain of the events surrounding his representation, which he related to the passage of ten years between the

specific factual findings and legal conclusions regarding, *inter alia,* trial counsel's effectiveness connected with the alleged failure to present mitigating evidence).

■ Basemore's argument respecting the mental health evidence initially presents the same circumstance, namely, trial counsel's generalized testimony concerning his inquiries, and conflicting testimony from Basemore's family members, with no resolution by way of factual findings. Compounding this problem, the PCRA court summarily dismissed this claim for erroneous reasons, specifically, on the basis that the testimony of Drs. Toomer and Phillips would have been inadmissible since they were unable to opine that Basemore suffered from mental illness at the time of the offense, and their diagnoses were based upon information gathered solely from Basemore and his family. To the contrary, however, Drs. Toomer and Phillips each specifically opined that Basemore suffered from an extreme mental disorder at the time of the offense. *See* N.T. Apr. 22, 1997, at pp. 40, 91–92; N.T. Apr. 24, 1997, at pp. 129–31. Moreover, although the opinions of Drs. Toomer and Phillips were based primarily upon information from Basemore and his family, this fact does not, as a matter of law, render their opinions inadmissible or defeat the substance of such opinions. *See Commonwealth v. Neill,* 362 Pa. 507, 515–16, 67 A.2d 276, 280 (1949). *See generally* Pa.R.E. 703. Indeed, Dr. Stanton's evaluations, upon which the Commonwealth relies, were similarly based.

Since the reasoning supporting the decision to deny Basemore's claim of ineffective assistance of counsel in the penalty phase of trial is in error, we are relegated to our own review of the record. There are a number of indicators on the record

trial and the PCRA proceeding and the fact that his file had been transferred to appellate counsel. Nevertheless, the PCRA court bore the responsibility to consider the testimony of Basemore's family members, which, if believed, would establish that trial counsel's investigation failed to meet the minimum standard required to constitute effective assistance. Obviously, the PCRA court had the ability to rely upon trial counsel's description of his usual practices and procedures as circumstantial evidence of an investigation in compliance with constitutional minimums; the difficulty is that the PCRA court simply failed to confront Basemore's evidence.

suggesting that counsel's performance may have been deficient in connection with the development and presentation of mitigating evidence. First, counsel testified that he was limited in terms of the mitigating evidence he could present from family members without opening the door to the introduction of Basemore's prior robbery conviction; thus, it became particularly important for trial counsel to explore other avenues for establishing mitigation, and development of mental health evidence would seem to have been one logical course. Further, counsel conceded that he did not make a range of specific inquiries into the mental health area and, indeed, could affirmatively testify only that his general practice was to inquire about past medical or psychiatric treatment. Yet, trial counsel was also aware of a pattern of unusual behavior on Basemore's part, specifically, his dressing as a ninja and practicing martial arts in a cemetery, and the incorporation of parallel oddities into the circumstances of the crime. More important is Dr. Stanton's mental health evaluation, which trial counsel received at the commencement of the trial, diagnosing Basemore as having a mixed personality disorder, passive aggressive and schizoid features and underlying emotional instability.[20] Nevertheless, trial counsel failed to consult with a mental health expert, or even to contact Dr. Stanton for clarification of the existing diagnoses.

Counsel's stated basis for discounting the information which he had was his belief that Basemore's personality disorder and emotional instability did not satisfy the criteria for the statutory mitigators relating to an extreme mental or emotional disturbance; the capacity to appreciate the criminality of one's conduct; or a substantially impaired ability to conform one's conduct to the requirements of the law. *See* 42 Pa.C.S. § 9711(e)(2), (3). While some personality disorders may not satisfy the criteria for submission as statutory mitigators pursuant to Section 9711(e)(2) and (3), the essential import of

**20.** Significantly, this information was available well before trial as part of the sentencing record from Basemore's prior robbery conviction. Given trial counsel's awareness of this offense, it is clear that he should have made reasonable efforts to obtain what is generally standard information in cases involving serious felonies.

the testimony of Drs. Toomer and Phillips was that the personality disorders at issue here were potential indicators of conditions which would provide such mitigating evidence, namely, schizo-affective and bipolar disorder. *See generally* American Psychiatric Assoc., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 630 (4 th ed.1994).

Thus, while the diagnoses contained in Dr. Stanton's reports alone may not have countered the Commonwealth's potent aggravating evidence (i.e., that the murder of an elderly security guard was committed in the course of a robbery of the victim's employer),[21] the more difficult issue raised by Basemore is whether such reports should have triggered further investigation resulting in the presentation to the jury of opinions, such as those of Drs. Toomer and Phillips, to the effect that Basemore suffered from an extreme mental condition which substantially impaired his ability to conform his conduct to the requirements of the law, and which, if believed, would have established a significant mitigating circumstance.

 It thus becomes clear that a particularized assessment of the credibility of the testimony of Drs. Toomer and Phillips is essential to the resolution of all aspects of Basemore's claim of ineffectiveness (arguable merit, reasonable basis and prejudice). Such assessment is relevant to arguable merit, as it controls the determination of whether further

---

21. Although the evidence of Basemore's personality disorder alone would not appear to be sufficient to satisfy the criteria for subsections (c)(2) or (c)(3), such evidence would, at a minimum, have been admissible into evidence under the catchall mitigator in Section 9711(e)(8). *See generally Eddings v. Oklahoma*, 455 U.S. 104, 115–16, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982)(explaining that evidence of a difficult family history and emotional disturbance is typically introduced by defendants in mitigation); *Smith v. Stewart*, 189 F.3d 1004, 1008–11 (9 th Cir.1999). While some courts have suggested generally that evidence of personality disorders carries minimal weight in a sentencing proceeding, *see, e.g., State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685, 712 (1997), we make no such categorical pronouncement here. Rather, we merely recognize the substantial difference between the opinions offered by Drs. Toomer and Phillips to the effect that Basemore suffered from an extreme mental impairment at the time of his offense which substantially impaired his ability to conform his conduct to the requirements of the law, and the general assertion of a personality disorder.

investigation on the part of trial counsel would have uncovered the mitigating evidence contained in their opinions; to reasonable basis, because one aspect of the experts' testimony is the suggestion that Dr. Stanton's report contained information predictive of their own diagnoses; and to prejudice, for the reason that the testimony of Basemore's experts, if believed, provides a substantially more compelling basis for finding a reasonable probability that, had such evidence been presented in the penalty phase of trial, the outcome of the proceeding would have been different. As the necessary assessment of the experts' credibility is most appropriately accomplished, in the first instance, by the finder of fact, we will remand to the PCRA court for issuance of factual findings and revised conclusions of law.[22]

■■■ On remand, the PCRA court should consider each element of Basemore's ineffectiveness claim (arguable merit, reasonable basis and prejudice).[23] With regard to arguable

22. We note that, unlike those instances where the opinion of this Court has resulted in a remand for a new penalty hearing, the record does not establish that trial counsel completely failed to investigate and prepare for the penalty phase, see, e.g., Commonwealth v. Perry, 537 Pa. 385, 390–92, 644 A.2d 705, 708–09 (1994), or ignored an existing institutional history of his client's mental illness. See, e.g., Commonwealth v. Smith, 544 Pa. 219, 244, 675 A.2d 1221, 1233–34 (1996), cert. denied, 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997). Nevertheless, ineffectiveness is not limited to such circumstances. Moreover, the present circumstances suggest that counsel may have had a duty to further pursue the mental health issues, the record does not reflect any strategic reason for the decision not to investigate further, and, if the testimony of Basemore's experts is believed, the mental health evidence is not of such a nature that its impact was of speculative weight and may have been interpreted as unfavorable. Cf. Howard, 553 Pa. at 277 n. 5, 719 A.2d at 238 n. 5 (collecting cases and noting, inter alia, that a suggestion of mere impulsiveness could be interpreted by a jury as an unfavorable indication of future dangerousness). Nor is there a basis on the record for concluding that Basemore himself affirmatively made the decision not to offer mental health evidence. Cf. Commonwealth v. Taylor, 553 Pa. 144, 149, 718 A.2d 743, 745 (1998)(holding that counsel's failure to override defendant's decision not to present mitigating evidence during penalty phase was not ineffective assistance of counsel).

23. Ordinarily, a claim of ineffectiveness may be denied by a showing that the petitioner's evidence fails to meet a single one of these prongs. See generally Rollins, 558 Pa. at 542–44, 738 A.2d at 441.

merit, the PCRA court is directed to resolve the conflicting testimony concerning the extent of the inquiries made by trial counsel to family members, as well as to consider, among all other relevant factors: the nature and extent of the evidence which actually was presented by trial counsel in the penalty phase of trial; the relevance of trial counsel's strategy of limiting the presentation to non-character-related evidence so as not to open the door to the admission of Basemore's prior robbery conviction; the extent to which such strategy suggested or required pursuit of alternative avenues for the development of mitigating evidence; the potential impact of mental health evidence in terms of providing some counterweight to the Commonwealth's evidence in aggravation; trial counsel's awareness of Basemore's bizarre behavior; trial counsel's actual and constructive awareness of the information contained in each of the Stanton reports; and the extent to which such reports suggest that further investigation would have led to evidence of the character contained in the reports of Drs. Toomer and Phillips.[24] With regard to reasonable basis, the PCRA court is directed to expressly evaluate, among all other relevant factors, trial counsel's testimony that he would have considered using evidence along the lines of Drs. Toomer's and Phillips' testimony had he known of its availability. With regard to prejudice, the PCRA court is directed to expressly determine the credibility of the diagnoses presented by Basemore's experts. In connection with this inquiry, the PCRA court is to consider the extent to which the testimony of Basemore's experts is contradicted or uncontradicted on the record, particularly in light of the fact that the Commonwealth did not present rebuttal expert testimony, and the argument that the testimony of Basemore's experts may be viewed as

24. Concerning the Commonwealth's argument that Dr. Stanton's reports rendered any further inquiry into Basemore's mental health unnecessary, the PCRA court should bear in mind the considerable difference between competency to stand trial or take part in sentencing, which Dr. Stanton found, and mental health problems that may warrant mitigation at sentencing. *See Blanco v. Singletary,* 943 F.2d 1477, 1503 (11 th Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992).

consistent with Dr. Stanton's underlying findings.[25] To the extent that the PCRA court may find that Drs. Toomer and Phillips lack credibility, it is directed, in any event, to assess the extent to which the diagnoses contained in Dr. Stanton's reports would have constituted mitigating evidence pursuant to Section 9711(e)(8) and the corresponding impact upon Basemore's ineffectiveness claim in terms of arguable merit, reasonable basis and prejudice.

Therefore, the order of the PCRA court is reversed and the case is remanded for an evidentiary hearing and findings of fact and conclusions of law regarding the claim of discrimination in the jury selection process and for factual findings and legal conclusions relating to the penalty phase claim. Jurisdiction is relinquished.

Justice CASTILLE did not participate in the consideration or decision of this case.

---

25. The PCRA court remains free to consider, as elements of its assessment, the facts that the opinions of Drs. Toomer and Phillips are based upon interviews with Basemore, and that there are no records of mental illness on the part of Basemore contemporaneous with the time of his offenses. It simply may not treat these factors as dispositive as a matter of law, but rather, must consider all of the evidence, resolve conflicts, and render adequate factual findings and legal conclusions.