### Commonwealth v. McFarlin

*Alisa R. Hobart, assistant district attorney,* for Commonwealth.

*J. Allen Daringer,* for defendant.
*Michael Dautrich,* trial attorney for defendant.

SCHMEHL, J.L., *P.J.,* May 19, 2009—

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *Factual Background*

This case arose from the January 21, 2001 shooting death of Jaime Dvorak. On January 21, 2001, Police Officer Craig Ziemba, Reading Police Department, in the City of Reading, Berks County, Pennsylvania, was on patrol when he got a call to respond to a shooting at 1259 North 10th Street in Reading.[1] Upon Officer Ziemba's arrival at the scene just before noon, Jaime Dvorak (the victim), had already been pronounced dead by ambulance personnel. Officer Ziemba located the victim sitting on the steps of the building's interior stairwell, close to apartment number 4, which she shared with the defendant/petitioner, Shauvin McFarlin. The victim had a towel on her shoulder, and there was a blood spatter on the wall close by.

Police Sergeant Donald Matz, Reading Police Department, was also called to the crime scene just before noon on January 21, 2001. While collecting evidence in the apartment, Sergeant Matz collected a cartridge casing from behind a couch which had been moved away from the outside door it blocked in the apartment. The spent .38 caliber cartridge casing was of the kind typically

---

1. All portions of the "factual background" section here are taken from the notes of transcript of trial, held on March 7, 11, 12 and 14, 2001.

expelled by a revolver-type firearm. The bullet later removed from the victim was determined by the Pennsylvania State Police lab to be of a .38 or .357 caliber. It was also later determined by the forensic pathologist that the victim had been shot through the upper left part of her back, and the bullet struck her lung and pulmonary artery, resulting in internal bleeding which led to her death.

The defendant and victim shared the apartment with Heather Dvorak, the victim's sister, and her boyfriend, Gary Higgins. The apartment lease was in the name of Heather Dvorak and Higgins, and the defendant and victim were staying there temporarily. At trial, Higgins said that he had smoked marijuana the night before the murder as well as the night prior to that. He also said that during the morning of January 21, 2001 he was at the apartment when the victim and the defendant left the apartment to go to McDonald's. Higgins said that after the defendant and victim returned from McDonald's, they both entered and then re-exited the apartment. The defendant and victim were arguing, something which Higgins and the victim's sister, Heather Dvorak, said the defendant and victim did several times every week.

Higgins said the arguing on January 21, 2001 was audible from inside the apartment where he was playing videogames. When the arguing got louder, Higgins paused his videogames. He then heard the defendant say "Why did you do that?" followed by a bump on a wall and then a gunshot, after which he heard the victim say something to the effect of "Why did you shoot me?" Higgins said he got up and locked the apartment door, and then opened the door when he heard the victim

knocking on it. Higgins said the victim was bent over, with blood coming out of her mouth, and said "Oh my God, Gary, Shawn just shot me. Call 911. I'll be alright." Higgins called 911, then got a towel and put it on the victim's shoulder.

Police Officer Felix Carr of the Reading Police Department testified at trial that he saw the defendant in the area of the shooting on January 21, 2001. Officer Carr said that on that day, he was dropping his wife off at her job at the district justice office in Reading, at approximately 11:34 a.m. In front of the building, he saw a young male standing by the District Justice Building, which is located near the apartment at 1259 North 10th Street in Reading. Officer Carr said he later recognized that young male as the defendant when he saw the defendant's photograph in the newspaper two days later.

In a statement given to the Reading Police Department by Stephen Skinner, a friend of the defendant, Skinner said that the defendant told him he had stayed at a relative's house the night after the shooting. Skinner said the defendant had confessed to the shooting to him the day after, when the defendant stopped at his house. At trial, however, when Skinner was questioned about the statement he gave, he said that he had not given portions of the statement as they were written, and that the defendant had not confessed to him. At trial, witness Larry Veney testified that while he and the defendant were incarcerated together, the defendant asked him for advice on his case, and that the defendant confessed to the murder.

## B. *Procedural Background*

The defendant was charged with murder of the first degree and related offenses in connection with the January 21, 2001 shooting death of Jamie Dvorak, his girlfriend and the victim. Defendant was represented at trial by Michael Dautrich, Esq. At the conclusion of the jury trial on March 14, 2002, in the Berks County Court of Common Pleas, the defendant was convicted of four crimes: murder of the first degree; aggravated assault; possession of the instrument of a crime with intent; and firearms not to be carried without a license.[2]

Accordingly, on April 10, 2002, this court sentenced the defendant to life in prison. On April 22, 2002, Attorney Dautrich filed a motion for entry of judgment of acquittal/arrest of judgment or, in the alternative for a new trial, which this court denied on April 26, 2002. Attorney Dautrich then filed a notice of appeal to the Superior Court of Pennsylvania, following which this court's judgment was affirmed. On June 25, 2004, the Supreme Court of Pennsylvania denied defendant's petition for allowance of appeal.

The defendant then filed a petition for post-conviction collateral relief on May 19, 2005. This court appointed Gail Chiodo, Esq. as counsel, and she was subsequently granted leave to withdraw her appearance on June 21, 2007. Also on June 21, 2007, this court appointed Lara Glenn Hoffert, Esq. as counsel, and she was subsequently granted leave to withdraw her appearance on January 7, 2008. This court then appointed J. Allen Dar-

---

2. 18 Pa.C.S. §2502(a), 18 Pa.C.S. §2702(a)(1), 18 Pa.C.S. §907(a) and 18 Pa.C.S. §6106(a), respectively.

inger, Esq. as counsel on January 7, 2008. The defendant submitted his own Post Conviction Relief Act petition, following which a PCRA hearing was held in this matter on July 1, 2008, at which Attorney Daringer represented the defendant. Both the Commonwealth and the defendant then submitted corresponding briefs. Following this court's December 31, 2008 order dismissing defendant's PCRA petition, defendant filed a "concise statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pa.R.A.P." on April 2, 2009.

## II. DISCUSSION

The defendant bases his concise statement on the following three assertions:

(1) The PCRA court erred when it did not find trial counsel ineffective when he "rejected defendant's version of the events," in that defendant referred to the shooting as accidental, and thus trial counsel did not pursue the defendant's trial strategy to term the shooting accidental;

(2) The PCRA court erred when it did not find trial counsel ineffective when he advised the defendant that his prior record could be admissible at trial, if the defendant were to testify at trial; and

(3) The PCRA court erred when it did not find trial counsel ineffective when he did not cross-examine witness Larry Veney in order to demonstrate that witness' possible bias and hope for favorable treatment from the prosecutor.[3]

---

3. In defendant's concise statement of errors complained of on appeal, defendant's third alleged error was that "[t]he PCRA court erred

In order for a PCRA alleging ineffectiveness of counsel to be successful, there are three points that the petitioner must prove.[4] First, a petitioner must show that the underlying claim is of arguable merit. Second, a petitioner must show that trial counsel's strategy did not have a reasonable basis to effectuate the client's interests. Third, a petitioner must show that trial counsel's strategy caused the petitioner prejudice, such that the outcome of the case would have been different if not for counsel's purported ineffectiveness. This test requires that the approach of trial counsel be evaluated in light of the available alternatives, and a finding of ineffectiveness is only made when the alternative approach would have offered a potential for success substantially greater than the tactics used.[5] When the court examines whether counsel's actions or omissions were reasonable, "we do not question whether there were other more logical courses of actions which counsel could have pursued: rather, we must examine whether counsel's decisions had *any* reasonable basis."[6] Where it is clear that a petitioner has failed to meet any of the three, distinct prongs of the test enumerated in *Pierce,* the claim may be disposed of on

---

in not cross-examining a witness (Larry Veney) on his hope for favorable treatment. . . ." For purposes of this memorandum opinion, this court has presumed that the defendant instead intended that the third alleged error should have read: "[t]he PCRA court erred in not finding that trial counsel provided ineffective assistance of counsel in not cross-examining a witness (Larry Veney) on his hope for favorable treatment. . . ."

4. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

5. *Id.* at 159, 527 A.2d at 976.

6. *Commonwealth v. Steele,* 599 Pa. 341, 360, 961 A.2d 786, 797 (2008) (emphasis in original) (citing *Commonwealth v. Rios,* 591 Pa. 583, 599, 920 A.2d 790, 799 (2007)).

that fault alone, without a determination of whether the other two prongs could have been met.[7]

## A. *The Use of Accidental Shooting Strategy, Rather Than an Insufficiency of the Evidence Strategy, in the Context that Trial Counsel "Rejected Defendant's Version of the Events"*

In his concise statement, defendant complains that the trial court erred when it did not find that trial counsel Attorney Dautrich inserted his "own version" of the facts. At the PCRA hearing, defendant explained further that he believed this error occurred when trial counsel did not utilize defendant's suggested strategy that the shooting was accidental. There is nothing in the record to indicate that trial counsel inserted a version of facts at odds with evidence presented. Instead, the trial and hearing records reflect that trial counsel weighed defendant's version of the murder, and found it would not be credible in front of a jury, as further described below.

If trial counsel Attorney Dautrich had pursued a trial strategy of describing the shooting as accidental, rather than the defense strategy trial counsel did pursue, he then would have had to pursue at least a lesser degree of murder for the defendant. At trial, Attorney Dautrich pursued the defense that the Commonwealth did not meet its burden of proof in showing that the shooter was the defendant, which left open the possibility that the shooter could have been someone else. It was a viable strategy at that time to try to show that the burden of proof had not been met, and to pursue a jury verdict of not

7. *Id.* (citing *Commonwealth v. Basemore,* 560 Pa. 258, 294 n.23, 744 A.2d 717, 738 n.23 (2000)).

guilty, rather than to pursue the accidental shooting theory, which would have included admitting pointing a loaded gun at the victim, thereby minimizing any chance of an acquittal.

Accidental shooting was not a good strategy for many reasons, including those discussed below. Further, the two strategies, an accidental shooting versus insufficiency of the evidence, are clearly mutually exclusive, such that they could not have both been pursued at the same time. As such, Attorney Dautrich appears to have chosen the strategy which, in his opinion, seemed the most viable to him as the case proceeded. This strategy was valid, and thus, defendant's claim to the contrary is not of arguable merit.

Additionally, it is logical that Attorney Dautrich pursued the burden of proof strategy in that this was reasonably of far greater plausibility to the jury than the strategy of an accidental shooting. Considering the tumultuous relationship between the defendant and his girlfriend, the victim, it is reasonable that a jury might not have believed that the shooting was accidental. There was ample testimony at trial from eyewitnesses that they had seen the defendant hit and strangle the victim during arguments long prior to the shooting. The autopsy report corroborated such testimony with notations that the victim had extensive bruises on her face, arms and legs.

Defendant argues further that witness testimony as to defendant's guilt defeated Attorney Dautrich's strategy, in that witness testimony from the scene of the murder exclusively went to defendant's responsibility for the shooting, without any other exculpatory witness testimony. Despite the witness testimony given at trial which

pointed toward the defendant's guilt for the murder, it was still reasonable for Attorney Dautrich to pursue the defense of insufficiency of the evidence. There was no "eyewitness" to the shooting. The only witness testimony came from Gary Higgins, whom the defense theorized was a possible alternative shooter, and therefore would have had a motive in providing testimony as to what he claimed he heard the defendant and his girlfriend say. At trial, Attorney Dautrich did cast doubt on how well the only "ear" witness actually could have heard the argument, considering that he, Higgins, was in the other room, with the door closed, and also did not see who was coming in and out of the apartment.[8] Attorney Dautrich also cast doubt on the credibility of Higgins by highlighting the fact that the witness had smoked a marijuana cigar the night prior, and implied may not have had reliable impressions of the events on the day of the shooting.[9]

Additionally, in order to pursue this accidental shooting theory, the defendant would have had to take the stand. As discussed below, Attorney Dautrich had reasons to counsel the defendant not to testify at trial. Further, trial counsel was concerned that the defendant would make a poor witness.[10] The defendant's testimony would have been necessary and critical for a defense of accidental shooting. Another reason why Attorney Dautrich did not pursue the accidental shooting theory, as Attorney Dautrich discussed at the PCRA hearing, was in order to exclude a potential witness who would have said that the

---

8. Notes of transcript, pp. 221-36, trial, March 7, 2002.

9. Notes of transcript, pp. 222-23, trial, March 7, 2002.

10. Notes of transcript, p. 34, PCRA hearing, July 1, 2008.

defendant had drawn a gun on him in the apartment building hallway a few days prior to the murder of the victim.[11] Again, for all of these reasons, trial counsel had a sound approach in the view of the court.

Although defendant asserts that trial counsel's strategy was somehow "fabricated," the defense of lack of evidence is always a viable defense. The trial strategy was that the Commonwealth did not meet its burden of proof, and that there was insufficient evidence to support a jury's decision that the defendant was guilty beyond a reasonable doubt. Further, the strategy was that no jury should convict someone of murder based on the evidence presented in this case. That argument, itself, was a reasonable trial strategy.

In preparing a defense, Attorney Dautrich's strategy had a reasonable basis, and was designed to effectuate his client's interests. Further, defendant did not show that Attorney Dautrich's strategy has met either of the remaining requirements of the three-part ineffectiveness of counsel test necessary to grant relief.

### B. *The Choice of Defendant Not To Testify at Trial, and Advice As to Admissibility of Prior Record*

In his concise statement, defendant alleges that this court erred when it did not find that Attorney Dautrich did not adequately counsel him in making the decision not to testify at trial. Particularly, defendant says that he was misinformed as to the admissibility of his prior record, when he was told that his prior conviction for invol-

---

11. Notes of transcript, p. 49, PCRA hearing, July 1, 2008.

untary manslaughter could be admissible at trial if he were to testify.

The defendant had two prior convictions in relation to the death of his infant child: one for involuntary manslaughter, and one for endangering the welfare of a child.[12] This court found that while it was not likely that the defendant's prior conviction for involuntary manslaughter would be admitted at trial were the defendant to testify, there was enough of a chance of its admission that trial counsel's advice of its possible admission had a reasonable basis. Furthermore, this court found that the defendant's prior conviction for endangering the welfare of a child would be admissible to rebut any assertions of the peacefulness, lawfulness, or non-violent aspects of the defendant's character, and as such could have been readily admissible.[13]

As Attorney Dautrich testified at the PCRA hearing, he thought the Commonwealth had a "fair likelihood" of bringing either the involuntary manslaughter or the endangering the welfare of a child conviction in at trial if the defendant were to testify.[14] Depending on how the defendant testified if he had taken the stand, there was a real possibility that his prior conviction for endangering the welfare of a child might have been admissible on cross-examination if: the defendant volunteered evidence of peacefulness of character or accidental shooting and thus would have been subject to cross-examination re-

---

12. 18 Pa.C.S. §2504(a) and 18 Pa.C.S. §4304.

13. Notes of transcript, pp. 9-12, 26, pretrial hearing, March 1, 2002.

14. Notes of transcript, p. 26, PCRA hearing, July 1, 2008. (emphasis added)

garding his conviction for endangering the welfare of a child; or, if he volunteered information that was at variance with his prior conviction for involuntary manslaughter.[15] Although it was more likely that the endangering the welfare of a child conviction would be admitted than would the involuntary manslaughter conviction, it was reasonable counsel to advise the defendant that either could be admitted at trial, such that it would be prudent for the defendant not to testify. These reasons for the defendant not to testify, along with the many other reasons Attorney Dautrich described at the PCRA hearing, described in the preceding and following sections of this memorandum opinion, certainly had a reasonable basis in the opinion of this court, and as such, this court did not find Attorney Dautrich ineffective.

A criminal defendant's decision not to testify is protected by the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.[16] It is well-established that a defendant who

---

15. *Commonwealth v. Hernandez,* 862 A.2d 647, 651 (Pa. Super. 2004) (describing how the defendant volunteered that since he became a junkie, he had never sold drugs, at odds with his prior convictions for possession with intent to deliver heroin) (citing *Commonwealth v. Trignani,* 334 Pa. Super. 526, 483 A.2d 862 (1984)) (describing a voluntary quip by defendant during cross-examination that he never shot anyone in his life, in conflict with his prior conviction for aggravated robbery where a store clerk was shot) (citing *Commonwealth v. Bastone,* 211 Pa. Super. 509, 239 A.2d 863 (1968)) (quoting the information volunteered by defendant on direct examination that he never robbed anyone in his life) (citing *Commonwealth v. Petrulli,* 182 Pa. Super. 625, 128 A.2d 108 (1956)) (quoting the information volunteered by defendant on direct examination that he had never been convicted of a crime in that particular court).

16. *Commonwealth v. Wright,* 599 Pa. 270, 308, 961 A.2d 119, 141 (2008).

made a knowing, voluntary, intelligent waiver of testimony may not later claim ineffective assistance of counsel for failure to testify.[17] In this case, the decision not to testify was clearly the defendant's. This court conducted a colloquy of the defendant on the record, although there is no express requirement that a trial court do so with a criminal defendant who chooses not to testify.[18]

The defendant was provided with safeguards to ensure his decision not to testify was his own. The trial record shows that the court conducted a colloquy to determine that the defendant made this decision not to testify knowingly, and of his own free will.[19] During the colloquy, this court asked the defendant whether he understood that his counsel planned to rest his case, that the defendant would not be called as a witness on his own behalf, and that he had the absolute right not to testify.[20] The defendant was also asked whether he had any questions for the court as to his decision not to testify, whether he had discussed the decision with his attorney, and whether he understood that it was his decision alone, and not his attorney's decision, as to whether he would testify.[21] Lastly, the defendant was asked whether he wanted to testify, to which he replied in the negative.[22]

---

17. *Commonwealth v. Lawson,* 762 A.2d 753, 755 (Pa. Super. 2000).

18. *Commonwealth v. Todd,* 820 A.2d 707, 712 (Pa. Super. 2003).

19. Notes of transcript, pp. 181-83, trial, March 11, 12, and 14, 2002.

20. *Id.*

21. *Id.*

22. *Id.*

## C. *The Degree To Which Trial Counsel Questioned Commonwealth Witness Larry Veney*

In his concise statement, defendant argues that the trial court erred when it did not find Attorney Dautrich was ineffective because he did not thoroughly cross-examine the Commonwealth witness Larry Veney. Witness Veney knew the defendant from their imprisonment together, and he himself offered to the Commonwealth that he would testify against the defendant. The record shows that Witness Veney wrote a number of letters to the district attorney, which the defendant claims indicated that Witness Veney's willingness to testify against the defendant might have been partially motivated by an interest in gaining assistance in his own case. Based on this allegation, the defendant claims that because trial counsel did not cross-examine Witness Veney on every letter, then trial counsel failed to demonstrate the possible bias in Witness Veney's testimony.

At trial, Attorney Dautrich adequately demonstrated the likely bias in Witness Veney's testimony, even without detailing the contents of every letter Witness Veney had previously sent to the district attorney. Trial counsel, in questioning Witness Veney, illustrated that Witness Veney had likely solicited information from the defendant in order to curry favor with his own prosecutors.[23] Trial counsel referenced the multiple letters Witness Veney sent to the district attorney. The jury knew that Veney was testifying for the purpose of getting favorable treatment in his own case. Trial counsel also raised inconsistencies in Witness Veney's description at trial, both

---

23. Notes of transcript, p. 130, trial, March 11, 12, and 14, 2002.

during direct and cross-examinations, of his criminal record and use of pseudonyms.[24] These inconsistencies cast doubt as to the reliability of Witness Veney as a witness. Furthermore. Dautrich described at the PCRA hearing how Witness Veney undermined his own credibility by poor presentation.[25] Further, Attorney Dautrich questioned Witness Veney as to his criminal history, an additional means of casting doubt on his credibility. A final reason that Attorney Dautrich thought it either unnecessary or imprudent to examine Witness Veney about every letter sent to the district attorney was that the letters contained numerous criticisms of the mental state and unrepentant mindset of the defendant, and posed a risk of unfavorable testimony against the defendant and provided a sound reason to exclude large parts of the letters.[26]

---

24. Notes of transcript, p. 115 (when asked why he was in Berks County Prison, Witness Veney said he was in for a case with his landlord regarding a fridge when he was moving out), p. 113 (Witness Veney said he was on parole, but also in prison), p. 122 (Witness Veney said he also had a 1987 charge for kidnapping, with a maximum/minimum range of sentencing of six-15 years, for which he got 15, and then was later arrested for receiving stolen property, and that for the instance with the fridge the case went to trial and found not guilty), p. 123 (Witness Veney said he did not use different names in the past), p. 133 (Witness Veney admitted that he had, in fact, used the name Larry Wilson instead of Larry Veney in the past), and pp. 131-32 (Witness Veney said he sent letters to the D.A.'s office, then he sent eight or nine more letters, and that the first letter he sent contained no details about the case at hand, indicating that the first letter was about his own case, and that there was a motive in his description of the supposed confession by the defendant), PCRA hearing, July 1, 2008.

25. Notes of transcript, p. 36, PCRA hearing, July 1, 2008 (wherein attorney described how Witness Veney made a poor witness, and his appearance at trial in turquoise-rimmed sunglasses).

26. Notes of transcript, p. 38, PCRA hearing, July 1, 2008.

▮▮▮▮▮▮▮▮▮▮

We found the overall cross-examination of Witness Veney to clearly be a satisfactory representation of the defendant at trial. Therefore, defendant did not meet his burden of proof in his ineffectiveness of counsel claim on this third matter. Trial counsel's approach had a reasonable basis in his strategy, which was designed to effectuate his client's interests, and does not meet defendant's claim of ineffectiveness of counsel.

As such, for the above-stated reasons, this court respectfully recommends that the instant appeal be denied.