J-S27029-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARVIN E. HILL | : | |
| | : | |
| Appellant | : | No. 1535 EDA 2021 |

Appeal from the PCRA Order Entered June 24, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005356-2011

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED JANUARY 4, 2023**

Appellant Marvin E. Hill appeals from the order[1] denying his timely first

Post Conviction Relief Act[2] (PCRA) petition.  Appellant alleges that the

Commonwealth improperly failed to disclose evidence and that his trial

---

[1] In his July 19, 2021 notice of appeal, Appellant stated that he was appealing from an order entered on June 24, 2020.  On August 19, 2021, this Court issued a rule to show cause why the appeal should not be dismissed as being from an order that was not entered on the docket.  Appellant filed a response on August 30, 2021, and he explained that the order was in fact entered June 24, 2021, rather than June 24, 2020, and that a typographical error had occurred.  As the docket reflects that the order Appellant challenged was entered June 24, 2021, and because Appellant filed a timely appeal on July 19, 2021, we are satisfied that the date on the notice of appeal was merely a typographical error, and we decline to quash the appeal.  ***See, e.g.***, ***Commonwealth v. Fretts***, 271 A.3d 383, 387 n.2 (Pa. Super. 2021), *appeal denied*, 281 A.3d 304 (Pa. 2022).  We have corrected the caption accordingly.

[2] 42 Pa.C.S. §§ 9541-9546.

counsel was ineffective. We reverse the PCRA court's order, vacate Appellant's judgment of sentence, and remand for a new trial.

The PCRA court summarized the facts of this case as follows:

On January 7, 2010, at about 6:30 p.m., in response to a radio call, Officer James Bryan arrived at the 1300 block of Cumberland Street and found Stacey Linwood Sharpe, Jr. [(the victim)], lying in the street shot. Officer Bryan transported Sharpe to Temple University Hospital, where at 10:24 p.m., he died. Sharpe suffered two gunshot wounds, one to the back that hit his lung and exited through the chest, and the other to the back of the right thigh.

On January 7, 2010, at about 6:30 p.m., Katerina Love was sitting at her window in her home on the 1200 block of West Cumberland Street when she heard gunshots. She looked out the window and saw [Appellant] shoot Sharpe about three or four times and then run southbound on 13th Street. Ms. Love described the shooter as "dark skin, almost six feet, about 130 pounds, clean shaven, maybe 20 or 21-years-old, black pants, a black jacket with a red polo horse on it and a black hat with the red polo horse." Ms. Love recognized [Appellant] as a man she had seen nearly every day outside of the store on 12th and Cumberland Street.

On May 11, 2010, Ms. Love identified [Appellant] from a photo array. At trial, Ms. Love did not identify [Appellant], testifying that she did not remember the incident.

From the 1200 block of Cumberland Street, officers recovered six, nine-millimeter fired cartridge cases [("FCC")], one bullet specimen and two bullet jackets. According to Police Officer Edward Eric Nelson, the six recovered [FCCs] were fired from the same firearm and both bullet jackets were fired from the same firearm.

On January 8, 2010, Detective Thorsten Lucke recovered surveillance video from a [corner] store located on the 2500 block of Sartain Street, a little over a block from the shooting. The video recorded the interior of the store, focusing at the door. The video showed [Appellant], who was wearing a knit hat with a Polo emblem, repeatedly entering and exiting the store for about an hour prior to the time of the [shooting]. At 6:31 p.m., Tyree Alston, who was visible in the video standing outside of the store,

- 2 -

pointed down the street and then walked out of view with a second unidentifiable person.

On April 28, 2010, [then-]Detective Nordo of the Homicide Unit was directed by an assigned detective to locate [Appellant], [Appellant's brother,] Michael Hill, and Alston, who had been identified from a surveillance video as potential witnesses to the homicide. Detective Nordo located [Appellant] and his brother on the 2500 block of Sartain Street in Philadelphia. Detective Nordo transported [Appellant] to the Police Administration Building ("PAB") in an unmarked minivan, while Michael Hill was transported in a separate vehicle.

At approximately 5:30 p.m., they arrived at the PAB and, pursuant to the assigned detective's instructions, entered the building through the rear entrance, the Police Detention Unit (PDU). [Appellant] was patted down and taken to the Homicide Unit. [Appellant] was seated on a bench in the Homicide Unit and told to wait.

At around 8:30 p.m., Detective Nordo interviewed Michael Hill. Michael Hill indicated that on January 7, 2010, at about 6:30 p.m., he was at the store at the corner of Sartain and Cumberland Streets, when Sharpe walked by and Alston started following him. Michael Hill then saw Alston pull out a gun and shoot Sharpe. Subsequently, on May 28, 2010, Michael Hill gave a second statement in which he indicated that both [Appellant] and Alston followed Sharpe and then he heard gunshots. The next day, [Appellant] told Michael Hill that he and Alston had shot Sharpe. On April 28, 2010, upon conclusion of Michael Hill's interview, which ended well past Detective Nordo's shift, Detective Nordo left the PAB.

On April 29, 2010, at 12:10 p.m., for reasons unknown to the [c]ourt, [Appellant] was placed in a cell in the PDU. He remained in the cell for approximately fifteen minutes. At 12:25 p.m., [Appellant] was checked out of the PDU cell and taken back to the Homicide Unit.

Detective Nordo arrived back at the Homicide Unit in the early afternoon and found [Appellant] sitting at a desk. At 1:55 p.m., Detective Nordo began taking [Appellant's] statement. Because Detective Nordo believed that at all times [Appellant] was

- 3 -

considered and being treated as a witness, he did not give [Appellant] *Miranda*[3] warnings.

Detective Nordo credibly testified that [Appellant] was never placed in handcuffs, neither when transported in the police vehicle nor while at the PAB. [Appellant] at all times appeared cooperative and forthcoming with information during his interview. After [Appellant] gave his statement he was free to leave and did so.

[Appellant] testified that during the motion hearing that in January of 2010 he had been brought into the PAB as a witness in the same homicide investigation and he stayed at the PAB for three days while he was interviewed before he was released. This [c]ourt credited this testimony and [Appellant]'s testimony that on April 29, 2010, after he was informed of his brother's statement, he decided to give a similar statement himself.

On May 27, 2010, Tyree Alston gave a statement to police. Alston explained that on January 7, 2010, [Appellant], Michael Hill, himself and others were hanging around the store on Sartain and Cumberland Streets. [Appellant] saw Sharpe and told Alston that Sharpe owed [Appellant] money. [Appellant] then ran after Sharpe and shot him. [Appellant] and Alston then went back to [Appellant's] home, where [Appellant] explained that he shot Sharpe because, "[i]f [he] let him get away with keeping [his] package, then anyone else would do it." On July 21, 2011, Alston sent [Appellant] a letter apologizing for giving the statement to police and indicated that his statement was a lie. At trial, Alston testified that it was two unidentified males who actually shot Sharpe, not [Appellant].

On May 31, 2010, Detective Sean Mellon of the Fugitive Squad began attempting to locate [Appellant]. On February 15, 2011, [Appellant] was arrested at his aunt's house at 1913 East Orleans Street.

At trial, Vincent Carter testified on behalf of [Appellant]. On January 7, 2010, at 6:30 p.m., Carter was driving on 13th Street and turned onto Cumberland Street. When Carter turned onto Cumberland, he saw one person shooting another person. Carter described the shooter as wearing a hoodie, skull cap, jeans and boots.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

PCRA Ct. Op. & Order, 6/24/21, at 3-5 (citations omitted).

The matter proceeded to a three-day bench trial on January 22, 2013. At trial, Appellant was represented by Gerald Stein, Esq. (Attorney Stein or trial counsel). Ultimately, the trial court convicted Appellant of third-degree murder, carrying a firearm without a license, carrying a firearm on a public street in Philadelphia, and possession of an instrument of crime.[4] On April 5, 2013, the trial court sentenced Appellant to an aggregate term of sixteen and one-half to forty-three years of imprisonment.[5,6] Appellant did not file any post-sentence motions. Appellant filed a timely direct appeal, and on March 13, 2014, this Court dismissed the appeal because Appellant failed to preserve any issues for appellate review. *Commonwealth v. Hill*, No. 1375 EDA 2013, 2014 WL 10979724 (Pa. Super. filed Mar. 13, 2014) (unpublished judgment order) (*Hill I*).

Appellant filed a timely *pro se* PCRA petition on July 16, 2014. The PCRA court appointed counsel, who filed an amended petition raising direct appeal counsel's ineffectiveness. The PCRA court ultimately dismissed Appellant's

---

[4] 18 Pa.C.S. §§ 2502(c), 6106(a)(1), 6108, and 907(a), respectively.

[5] Specifically, the trial court sentenced Appellant to fifteen to forty years of imprisonment for third-degree murder, and a consecutive term of one and one-half to three years of imprisonment for carrying a firearm without a license. The trial court did not impose any further penalty for carrying a firearm on a public street in Philadelphia and possession of an instrument of crime.

[6] The charge of intentionally failing to relinquish a firearm to a sheriff as required by order was *nolle prossed*.

petition on December 22, 2015. On appeal, this Court affirmed the PCRA court's order. However, on April 11, 2017, our Supreme Court reversed this Court's ruling and remanded the case with instructions. ***Commonwealth v. Hill***, 149 A.3d 362 (Pa. Super. 2016) (***Hill II***), *appeal granted, order rev'd*, 168 A.3d 1248 (Pa. 2017) (***Hill III***) (*per curiam* order). Following the Supreme Court's directive in ***Hill III***, this Court remanded the matter for the trial court to reinstate Appellant's post-sentence and direct appeal rights *nunc pro tunc*. ***Commonwealth v. Hill***, No. 60 EDA 2016, 2017 WL 3017086 (Pa. Super. filed July 17, 2017) (unpublished mem.) (***Hill IV***).

On remand, Appellant filed a post-sentence motion *nunc pro tunc*, arguing that the verdict was against the weight of the evidence. Specifically, Appellant claimed that there was no physical evidence that connected Appellant to the offenses and that the three eyewitnesses to the incident were not credible. ***See*** Post-Sentence Mot., 7/21/17, at 1. The trial court denied Appellant's motion on July 24, 2017. On appeal, this Court affirmed Appellant's judgment of sentence. ***Commonwealth v. Hill***, No. 2579 EDA 2017, 2018 WL 6259235 (Pa. Super. filed Nov. 30, 2018) (unpublished mem.) (***Hill V***). Appellant filed a petition for allowance of appeal with our Supreme Court, which he discontinued on March 28, 2019.

On March 29, 2019, Appellant filed a counseled, timely first[7] PCRA petition. On October 8, 2020, following a joint motion filed by Appellant and

---

[7] Because our Supreme Court restored Appellant's direct appeal rights *nunc pro tunc*, the instant PCRA petition is considered a "first" PCRA petition. ***See, e.g.***, ***Commonwealth v. Turner***, 73 A.3d 1283, 1286 (Pa. Super. 2013).

- 6 -

the Commonwealth, the PCRA court visited the crime scene, accompanied by counsel for both parties. Appellant subsequently filed an amended PCRA petition. Therein, Appellant raised a **Brady**[8] claim based on previously undisclosed exculpatory evidence that he discovered while reviewing the Commonwealth's file. Am. PCRA Pet., 10/20/20, at 27-31.

The PCRA court held an evidentiary hearing on January 29, 2021, during which Appellant presented the following previously undisclosed evidence: a full-length Computer Aided Dispatch (CAD) report, which was more detailed than the version used at trial; 911 calls from the time of the shooting; and the victim's cell phone records. N.T. PCRA Hr'g, 1/29/21, at 35-47. The PCRA court reconvened the evidentiary hearing on March 23, 2021, during which the parties presented evidence regarding radio communications between officers on the date of the murder, video surveillance footage of Appellant, and Appellant's interactions with former Detective Nordo. N.T. PCRA Hr'g, 3/23/21. During the third day of the evidentiary hearing on April 1, 2021, it was confirmed that Appellant's trial counsel never received the 911 calls or the victim's cell phone records from the Commonwealth. N.T. PCRA Hr'g, 4/1/21, at 17.

The PCRA court denied Appellant's petition on June 24, 2021. PCRA Ct. Op. & Order at 31. On July 19, 2021, Appellant filed a timely notice of appeal. Appellant filed a Rule 1925(b) statement on August 24, 2021. The PCRA court did not file a separate Rule 1925(a) opinion.

---

[8] **Brady v. Maryland**, 373 U.S. 83 (1963).

On appeal, Appellant raises the following issues for review, which we restate as follows:

1. Did the PCRA court err and/or abuse its discretion when it denied Appellant's PCRA petition alleging ineffective assistance of trial counsel?

2. Did the PCRA court err and/or abuse its discretion when it denied Appellant's PCRA petition alleging that the Commonwealth failed to disclose exculpatory evidence prior to trial?

3. Did the PCRA court err and/or abuse its discretion when it denied Appellant's PCRA petition alleging that the Commonwealth presented misleading and false evidence at trial?

Appellant's Brief at 4.[9]

In his first issue, Appellant argues that the PCRA court erred in rejecting his claim that Attorney Stein was ineffective. Appellant's Brief at 54. Specifically, Appellant asserts that Attorney Stein failed to introduce evidence concerning the correct time that the shooting occurred. In support, Appellant argues that his claim has arguable merit because trial counsel's error undermined Appellant's defense, which was that Appellant was in surveillance

_____

[9] Appellant presents a single question in his statement of the questions involved, which we have separated into three distinct issues. We also note that Appellant has divided his argument into five sections. *See* Pa.R.A.P. 2119(a) (stating that "[t]he argument shall be divided into as many parts as there are questions to be argued"). We do not condone Appellant's failure to comply with the Rules of Appellate Procedure, but because the noncompliance does not impede our review, we decline to find waiver on this basis. *See, e.g.*, *Commonwealth v. Levy*, 83 A.3d 457, 461 n.2 (Pa. Super. 2013) (declining to find waiver on the basis of the appellant's failure to comply with the Rules of Appellate Procedure, where the errors did not impede this Court's review).

footage from the Cumberland Deli and Grocery at the same time that the shooting occurred approximately one block away. *Id.* Appellant further argues that given the importance of establishing an accurate time of the shooting, trial counsel had no strategic reason to direct the trial court to the incorrect time of the shooting. *Id.* Appellant also claims that had trial counsel correctly established the time of the shooting, there is a reasonable probability that the outcome of his bench trial may have been different. *Id.*

Appellant additionally argues that the PCRA court made multiple errors in denying his PCRA petition. *Id.* at 55-61. Specifically, Appellant claims that several of the PCRA court's factual findings lack support in the record, including that (1) the time stamp on the surveillance video was up to one hour and one minute different than the actual time; and (2) there was an alleyway behind the convenience store, which Appellant could have used to return to the store after the shooting, at which point he appeared on the surveillance footage.[10] *Id.* at 55-56 (citing PCRA Ct. Op. & Order at 16, 18, 23, 28). Finally, Appellant contends that the PCRA court applied the incorrect legal standard in evaluating Appellant's ineffective assistance of counsel claim. *Id.* at 60-61. Specifically, Appellant argues that the PCRA court improperly required Appellant to provide evidence of his own innocence, establish that

---

[10] We note that Appellant raises additional claims regarding misconduct by Detective Phillip Nordo and the credibility of Love, who identified Appellant at trial. The Commonwealth concedes that Appellant would be entitled to relief on both issues. However, because we conclude that Appellant is entitled to relief on other grounds, we need not address these additional issues.

evidence presented at trial was insufficient to convict him, and that the Commonwealth had improperly suppressed the undisclosed evidence. *Id.* at 60 (citing PCRA Ct. Op. & Order at 15-16, 29-31). Therefore, Appellant concludes that the PCRA court erred in denying his PCRA petition and that he is entitled to a new trial. *Id.* at 62.

The Commonwealth concedes that the "[s]urveillance video shows that [Appellant] was likely in front of the corner store when the shooting occurred." Commonwealth's Am. Brief at 12. The Commonwealth also agrees with Appellant that the PCRA court's factual findings are not supported by the record. *Id.* at 27-32. Specifically, the Commonwealth contends that the record does not support the PCRA court's finding that that there is an alleyway behind the corner store which Appellant used to return to the store after the shooting. *Id.* at 27-28 (citing PCRA Ct. Op. & Order at 18, 28, 30-31; *see also id.* at 38-39. The Commonwealth further argues that the PCRA court misconstrued Detective Lucke's expert testimony at trial to conclude that the time stamp on the surveillance video could be up to one hour and one minute off from the actual time in support of the PCRA court's timeline of the shooting. *Id.* at 28-29 (citing PCRA Ct. Op. & Order at 16). Finally, the Commonwealth asserts that the PCRA court held Appellant to a standard that was overly burdensome, legally flawed, and "based on unsupported and incorrect findings of fact." *Id.* at 36-38. Therefore, the Commonwealth agrees that Appellant is entitled to relief.

Our review of the denial of PCRA relief is limited to "whether the record supports the PCRA court's determination and whether the PCRA court's decision is free of legal error." **Commonwealth v. Lawson**, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." **Commonwealth v. Mitchell**, 105 A.3d 1257, 1265 (Pa. 2014) (citation omitted); **see also Commonwealth v. Davis**, 262 A.3d 589, 595 (Pa. Super. 2021) (stating that "[t]his Court grants great deference to the findings of the PCRA court if the record contains any support for those findings" (citation omitted)).

When reviewing a claim of ineffective assistance of counsel, we are governed by the following standard:

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

> We have explained that a claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.

- 11 -

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043-44 (Pa. Super. 2019) (citations omitted and formatting altered).

It is well settled that a criminal defense attorney has a professional duty to conduct reasonable investigations. *Commonwealth v. Basemore*, 744 A.2d 717, 735 (Pa. 2000) (citing *Strickland v. Washington*, 466 U.S. 668, 691 (1984)).

Here, the record reflects that the Commonwealth provided a CAD report to the defense prior to trial. The report indicated that authorities received the first 911 call reporting the shooting at 6:29:47 p.m., as reflected by the time notation and the abbreviation "REC." Am. PCRA Pet., 10/20/20, at Ex. F. At trial, Attorney Stein based his argument on the fact that the shooting occurred "no later than" 6:30:29 p.m., which was the time that police received the report from the initial 911 call. *See* N.T. Trial, 1/28/13, at 225.

In addressing trial counsel's alleged error, the PCRA court explained:

At trial, defense counsel's theory of the case centered around his argument that [Appellant] was captured on camera standing in front of the Cumberland Deli Grocery more than three hundred fifty feet from the location of the shooting at the time it took place. To support this contention, trial counsel presented, along with other evidence, the trial CAD report to demonstrate that the first dispatch to the of this shooting was recorded at 6:30:29 p.m. In his closing, trial counsel argued that, the timing of the dispatch necessarily indicated that the shooting took place at some time prior to the first report associated with the shooting, asking the [c]ourt to conclude that the shooting took place while he was being recorded on camera.

The evidence contained in the newly-discovered full CAD report has been presented to this [c]ourt by both the Commonwealth and [Appellant] in an attempt to demonstrate that the instant shooting in fact took place at 6:29:17 p.m., approximately thirty seconds prior to the first 911 call that was reported at 6:29:47 p.m. This evidence was presented in conjunction with the video surveillance footage, which was presented to this [c]ourt at trial, demonstrating that [Appellant] approached the Cumberland Deli Grocery at 6:29:15 p.m. before the shooting took place, and remained at that location until 6:31:37 p.m., after the shooting took place.

The record demonstrates that trial counsel did not make a faulty factual averment concerning the exact time that the instant shooting occurred. In his closing, trial counsel was careful to assert that the decedent was shot at some time prior to 6:30:29 p.m. Given the evidence presented in this case, and now after review of the evidence presented in this collateral proceeding, a more specific pronouncement concerning that time would have been impossible. The evidence presented in the trial CAD report aligns with that currently brought forward by the Commonwealth and [Appellant]. While it is useful in demonstrating the elapse of time after the first witness reported the shooting in this matter, it is insufficient to preclude this [c]ourt's finding that [Appellant] returned to the Cumberland Deli Grocery shortly after the shooting.

PCRA Ct. Op. & Order at 14-15.

As the PCRA court further explained,

In his closing arguments, trial counsel went as far as to argue that the shooting must have taken place at some point prior to 6:30:29

p.m., an argument that this [c]ourt credited. None of these factual circumstances were in dispute at trial, nor are they in dispute after the evidentiary hearing. However, the presented 911 calls and full CAD report do little to bring the Commonwealth's and [Appellant's] proposed time of shooting beyond the realm of mere speculation.

In October of 2020, months before the evidentiary hearing in this matter, the Commonwealth, [Appellant], and this [c]ourt visited the scene of the instant shooting. During that visit, this [c]ourt noted the distance between where the shooting was said to have taken place, the corner store where [Appellant] was captured on camera, and the length of the alleyway behind the corner store. By this [c]ourt's estimate, even if the [c]ourt accepted the Commonwealth's and [Appellant's] contention that only thirty seconds had elapsed between the time of the shooting and the time of the first 911 call at 6:29:47 p.m., [Appellant] had ample time to navigate the back alleyway and appear on the surveillance camera, approaching from an easterly direction.

Ultimately, the presentation of the full CAD report does not change this [c]ourt's factual analysis of the circumstances surrounding the instant shooting. While serving as the factfinder during the January 2013 bench trial, this [c]ourt served as the sole arbiter of credibility and the weight of the evidence, was free to believe all, part, or none of the evidence presented at trial. In a bench trial, the trial court is presumed to know the law, ignore prejudicial statements, and disregard inadmissible evidence.

Because this [c]ourt had the opportunity to hear and see the evidence presented at the time of trial, including the signed witness statements provided to investigators, new evidence must be considered in light of this [c]ourt's factual determinations as previously rendered at trial. At trial, this [c]ourt considered evidence and argument demonstrating that the instant shooting took place sometime prior to 6:30:29 p.m. The information provided in the full CAD report does not fundamentally alter the evidence presented to this [c]ourt at trial, instead it merely supplements the evidence previously known to this [c]ourt when it was making its determination. For that reason, [Appellant] cannot demonstrate prejudice . . . with respect to his claim.

\* \* \*

At trial, the Commonwealth argued that [Appellant] shot the decedent after appearing on video surveillance in front of the

- 14 -

[corner store]. This argument was thoroughly challenged by the defense at trial, who employed the trial CAD report to establish that the shooting took place no later than 6:30:29. This evidence, like the other information contained in the reports the Commonwealth and [Appellant] presented during this litigation, is sufficient to support the timeline of events after witnesses had already discovered the decedent's wounds and called 911. This case instead hinges on the timeline and sequence of events after the first shot rang out. The timing of the phone calls does not preclude the factual determination that [Appellant] traversed the alleyway behind the [corner store] immediately after the shooting and reappeared on camera, approaching from the east side of the store. For that reason, this [c]ourt gives this evidence little credence, and does not find it sufficient to overturn the verdict.

\*     \*     \*

To grant [Appellant's] motion for a new trial based on the sequence of events presented in this proceeding, this [c]ourt would be required to adopt an implausible sequence of events that had multiple eyewitnesses call 911 mere seconds after the instant shooting, with the assailant running towards the decedent's body moments after he shot him. This [c]ourt cannot credit a factual scenario that includes the shooter firing six shots at the decedent from a fixed location before sprinting towards his body and past a potential eyewitness before escaping down the busiest thoroughfare in the area. This [c]ourt rejects the Commonwealth's and [Appellant's] contention that the decedent was shot and killed a mere thirty seconds before the first 911 call was recorded. [Appellant] failed to present evidence, such as live witness testimony, demonstrating that [Appellant] was absent from the area of the shooting, and was otherwise incapable of committing the instant murder. Based on the layout of the area, [Appellant] had ample time to return to the [corner store] in the immediate aftermath of the shooting. This [c]ourt . . . cannot conclude that [Appellant] has met his burden. Accordingly, his claims fail and the petition must be dismissed.

*Id.* at 18-19, 23, 30-31 (citations omitted).

Following our review of the record, we conclude that the PCRA court erred in denying Appellant's petition. *See Lawson*, 90 A.3d at 4.

- 15 -

As noted previously, the record reflects that the time of the shooting was a central question in this case. Indeed, Attorney Stein confirmed at the PCRA hearing that the time that the shooting occurred was of "paramount importance" to the defense. N.T. PCRA Hr'g, 1/29/21, at 15. At trial, the trial court heard evidence that the shooting occurred **after** Appellant was seen in surveillance footage from Cumberland Deli and Grocery at 6:29:31 p.m.[11] **See** N.T. Trial, 1/28/13, at 22 (indicating that the police first received report of the shooting at 6:30:29 p.m.). In his closing argument, Attorney Stein emphasized the fact that although Appellant was in the store at 6:29:31 p.m., the shooting was reported to police at 6:30:29 p.m. **See id.** at 225; **see also** Am. PCRA Petition, 10/20/20, at Ex. F. During the PCRA hearing, Attorney Stein confirmed that his focus was on "[06]:30:29, reporting of the shooting, and how that related back to the timestamp on the store video." N.T. PCRA Hr'g, 1/29/21, at 38. Attorney Stein also explained that he gleaned this information from the CAD report that the Commonwealth disclosed to him prior to trial. **See id.** at 37. However, the record reflects that in addition to the timestamp indicating when the report was made to police, the CAD report also states that authorities received the first 911 call about the shooting at

---

[11] During trial, Detective Lucke testified that he compared the timestamp on the surveillance video with the series of clocks at the U.S. Naval Observatory in Washington, D.C. N.T. Trial, 1/25/13, at 8. He noted that due to Daylight Savings Time, the timestamp on the surveillance video was off by, "an hour and some seconds. It was not an hour and a minute, an hour and ten minutes. This was approximately one hour and some seconds. I did not document the seconds. It was less than an hour and a minute." **Id.** at 9.

6:29:47 p.m., some 42 seconds earlier than the time that trial counsel relied on during closing argument. *See* Am. PCRA Pet., 10/20/20, at Ex. F. Although Attorney Stein confirmed that he understood that the 6:29:47 p.m. notation indicated when the first 911 calls were made and received, *see* N.T. PCRA Hr'g, 1/29/21, at 64, Attorney Stein did not use that information to corroborate Appellant's alibi as depicted in the surveillance footage. Therefore, because Attorney Stein failed to reasonably investigate the veracity of Appellant's potential alibi defense, we conclude that Appellant's claim has arguable merit. *See Basemore*, 744 A.2d at 735.

With respect to the reasonable basis prong, Attorney Stein stated during the PCRA hearing that he "felt like it was sufficient to rely on the timing in the CAD report instead of making an issue out of the time of the 9-1-1 calls[.]" N.T. PCRA Hr'g, 1/29/21, at 80. However, Attorney Stein acknowledged that in cases where there is an alibi defense that is potentially corroborated by video evidence, minutes, even seconds, "could make all the difference in terms of whether . . . the alibi defense is going to be accepted by the fact finder[.]" *Id.* at 87. In light of Attorney Stein's testimony, we conclude that Appellant has met his burden of proving that Attorney Stein lacked a reasonable basis for centering his trial argument around the "report" time of the shooting as noted in the trial CAD report. *See Sandusky*, 203 A.3d at 1043.

Further, there is a reasonable probability that had Attorney Stein centered his argument on the fact that the shooting occurred prior to 6:29:47

p.m., there could have been a different result at trial. ***See id.*** at 1044. As noted above, ascertaining the timing of the shooting was of paramount importance. ***See*** N.T. PCRA Hr'g, 1/29/21, at 15. Attorney Stein further noted that in such cases, seconds "could make all the difference in terms of whether . . . [a] defense is going to be accepted by the fact finder[.]" ***Id.*** at 87. Moreover, the Commonwealth concedes that not only is Appellant entitled to relief, but he is "likely innocent." Commonwealth's Am. Brief at 5 (citing Commonwealth's Post Hr'g Brief at 1, 3-4 (stating that evidence of record establishes Appellant's "entitlement to relief and his likely innocence.")). Therefore, because Appellant's conviction was heavily dependent on the evidence establishing the amount of time between the surveillance video and the time of the shooting, we agree with the parties that the PCRA court erred in rejecting this claim. ***See Commonwealth v. Stewart***, 84 A.3d 701, 714 (Pa. Super. 2013) (*en banc*) (finding ***Strickland*** prejudice when defense counsel failed to adequately investigate a potential alibi).

Finally, we note that in its Rule 1925(a) opinion, the PCRA court rejected Appellant's ineffectiveness claim based on its own theory that Appellant could have been in the alleyway behind the corner store immediately after the shooting and then returned to the store, at which point Appellant would have reappeared on the store's video camera. PCRA Ct. Op. & Order at 18, 23, 28, 31. However, the record contains no evidence to support this theory of the case. ***Compare id. with*** N.T. Trial, 1/28/13, at 238-39 (reflecting the Commonwealth's argument that Appellant committed the shooting after he

left the store and did not return to the store); *see also* Ex. C-2 (map of the crime scene and the surrounding area).

Likewise, the record does not support the PCRA court's hypothesis that the time stamp in the corner store surveillance video was up to one hour **and one minute** off from the actual time. *Compare* PCRA Ct. Op. & Order at 16 (noting that there was an hour discrepancy between the time stamp on the surveillance video and the real time "presumably due to the semi-annual change in clocks of [D]aylight [S]avings [T]ime" and that "the time stamp could be reflecting a time up to one minute off from the actual time memorialized on video") *with* N.T. Trial, 1/25/13, at 8-9 (reflecting Detective Lucke's testimony that because the time stamp on the video had not been adjusted for the end of Daylight Savings Time, it was off by "an hour and **some seconds**. It was not an hour and [a] minute"). For these reasons, we conclude that the PCRA court's findings are not entitled to deference. *See Lawson*, 90 A.3d at 4 (explaining that "[t]he PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record" (citations omitted)); *see also Davis*, 262 A.3d at 595.

In sum, we conclude that Attorney Stein's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Accordingly, we are compelled to reverse the PCRA court's order and remand for a new trial.[12]

---

[12] As noted previously, in light of our disposition, we do not address the merits of Appellant's remaining claims.

Order reversed.  Judgment of sentence vacated.  Case remanded for a new trial.  Jurisdiction relinquished.

Judge Stabile concurs in the result.

Judge Sullivan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/04/2023